COMMONWEALTH vs. HERBERT ANDREWS, JR.
(and three companion cases [1]).

Plymouth. September 12, 1988. — November 29, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & NOLAN, JJ.

*Constitutional Law,* Double jeopardy. *Homicide. Practice, Criminal,* Mistrial, Argument by prosecutor, Instructions to jury. *Evidence,* Consciousness of guilt, Prior consistent statement, Recent contrivance, Prior conviction, Prior misconduct, Relevancy and materiality, Nonexistence of evidence, Prior inconsistent statement, Cross-examination, Chain of custody. *Joint Enterprise. Witness,* Impeachment, Accomplice. *Search and Seizure,* Threshold police inquiry, Plain view.

Retrial of criminal defendants after a mistrial caused by the jury's inability to reach verdicts was not barred by double jeopardy principles. [446-449]

Prejudice, if any, to defendants at a criminal trial, occasioned by the prosecutor's asking a witness if she were under police protection, was cured by the trial judge's immediate and forceful instructions to the jury. [449-450]

In the circumstances of a murder trial, there was no basis for a conclusion that the prosecution had acted improperly by calling as a witness the mother of one of the victims. [450-451]

At a criminal trial, prejudice, if any, occasioned by the spontaneous outbursts of two prosecution witnesses was cured by the trial judge's immediate instructions to the jury to disregard the remarks. [451-452]

At a murder trial, sufficient evidence was presented of three individuals' continuing joint venture to conceal the killings, so that the evidence of one joint venturer's flight and use of a false name was admissible against the others. [452-454]

At the trial of murder indictments there was no error, in the circumstances, in the admission of evidence of a witness's prior consistent statement offered to rebut an implication of recent fabrication. [454-455]

At the trial of murder indictments, the judge properly exercised his discretion in declining to rule in advance whether the two defendants' criminal records would be admissible to impeach them, and there was no error in the judge's indication of what his likely ruling would be. [456-457]

---

[1] Two against Thomas P. Cormier and one against Herbert Andrews, Jr.

There was no merit to the contentions of two defendants on appeal from their convictions of murder that the prosecutor's closing argument was improper. [457-458]

In the circumstances of a murder trial, the judge's general instructions adequately addressed the issue of the need for corroboration of the testimony of a witness who had been granted immunity. [458-459]

At a murder trial, evidence of a prosecution witness's prior misconduct, offered by the defendants to impeach her credibility, was properly excluded by the judge [459], and evidence relevant to the issue of a defense witness's credibility was properly admitted [459-460].

The judge at a murder trial correctly ruled admissible a knife and baseball bat seized by police from the possession and control of one of the defendants, where the stop and frisk which resulted in the seizures was justified on the basis of threats the defendant allegedly had made. [460]

At a murder trial, the testimony of a police officer on rebuttal that one defendant's brother, an alibi witness, had failed to offer exculpatory information two days after the killings, in circumstances where it would have been natural to do so, was properly admitted to impeach the alibi witness. [461]

The judge at a murder trial acted correctly to prohibit defense counsel from asking questions on cross-examination that were prejudicial and had no probative value. [461-462]

At the trial of murder indictments, an item of blood-stained clothing identified as worn by one of the defendants on the night of the killings was sufficiently authenticated to obviate the necessity of establishing a chain of custody [462], and the unobjected-to admission of expert testimony about the blood stains created no substantial risk of a miscarriage of justice [462-463].

At a criminal trial, the judge correctly declined to give a defendant's requested jury instruction on the issue of police "failure" to follow recognized procedures by omitting certain tests during their investigation, where no evidence raised such an issue. [463]

INDICTMENTS found and returned in the Superior Court Department on December 3, 1984.

A pretrial motion to suppress evidence was heard by *Augustus F. Wagner, Jr.,* J. and the cases were tried before him.

*Willie J. Davis* for Herbert Andrews, Jr.

*Joseph F. Krowski* for Thomas P. Cormier.

*Mary Ellen O'Sullivan,* Assistant District Attorney, for the Commonwealth.

The defendants, pro se, submitted a brief.

LIACOS, J. The defendants challenge their convictions of murder in the first degree after two trials, the first of which resulted in a mistrial because the jury could not reach any verdicts. The defendants assert that the second trial should have been barred by double jeopardy pinciples. Alternatively, the defendants seek a third trial because of claimed errors in the second trial. We reject the defendants' double jeopardy argument. We conclude that there was no reversible error in the second trial. Thus, we affirm their convictions.

We summarize the evidence put before the jury at the second trial. Additional facts pertinent to the various issues argued by the defendants will be set forth as those issues are considered. On October 8, 1984, Thomas Sylvester (Sylvester) and William O'Connor were shot and killed in the home of Carol Sylvester. Carol Sylvester testified as follows.[2] The defendant Herbert Andrews, Jr., had been living with Carol Sylvester's sister, Donna Bolinder, for about six months prior to the shootings. Carol Sylvester recently had been separated from Robert Sylvester, the victim's father. In late August, 1984, she had an intimate relationship with Andrews. She did not tell her sister of this until some time after the shootings. Andrews was interested in continuing a sexual relationship with Carol Sylvester, but she declined.

On October 2, 1984, six days before the shooting, Carol Sylvester slept with O'Connor, having been introduced to him by Sylvester the previous night. At that time, O'Connor and Sylvester enlisted her help to sell a quantity of marihuana. On October 3, Andrews telephoned Carol Sylvester repeatedly while she, Sylvester, O'Connor, and a woman friend were engaged in a card game. Sylvester intercepted two such telephone calls, argued with Andrews, and challenged him to meet and to bring his "cap pistol," if he wished. Bolinder, who was present with Andrews when he placed these calls, testified that Andrews threatened someone on the telephone, "I fight to win, I fight to kill. I'll blow your head off." Other witnesses for the

---

[2] Carol Sylvester had been granted immunity from prosecution. See G. L. c. 233, §§ 20C-20I (1986 ed.).

Commonwealth testified that Andrews approached Carol Sylvester's house that night and destroyed the window of an automobile parked near the house by firing several bullets through it. Bolinder and Carol Sylvester testified that Andrews later had expressed surprise and disappointment that the automobile was not Sylvester's but instead was O'Connor's.

Bolinder testified that the next morning, October 4, Sylvester and O'Connor met Andrews in front of Bolinder's house. O'Connor stated to Andrews, "I have no beef with you, I just want my windshield fixed." Sylvester then said, "I have the beef with you, punk," and struck Andrews twice in the face, knocking him to the ground. The three men then entered the house and talked, while Bolinder was in the adjoining room. Shortly thereafter, a police cruiser arrived at her house, perhaps because a neighbor had telephoned the police. Andrews then entered her room and gave her a gun, which she knew to be his and which she knew to be empty. He also gave her three bullets. Bolinder testified that Andrews had asked her to load the gun and that she responded, "What are you, crazy, no one's getting shot in my house." The police did not enter Bolinder's home.

Bolinder testified that, after the police had departed, Sylvester and O'Connor arranged for the automobile to be repaired and told Andrews to pay $200 to them by the next day. Bolinder testified that Andrews later met with Thomas P. Cormier, who told Andrews to look at the injury to his face and to pay none of the $200.

Carol Sylvester testified that on October 6 the two defendants arrived at her mother's house, shouted at her, accused her of siding with Sylvester and O'Connor by informing them of Andrews' whereabouts, and reminded her that she had known the defendants for many years longer than she had known Sylvester and O'Connor. The defendants then threatened to kill her if she let anyone know "what was going on." These threats frightened her. Andrews also stated that Sylvester and O'Connor "are dead," and persuaded Carol Sylvester to telephone both victims and to lure them to her house the next day by stating that she had a buyer for some of their marihuana. On

October 7, the defendants arrived at her house with two guns and some rope and told her that she was to let the victims into the house and slam the door, whereupon the defendants would tell her to go into the bedroom, and would then use the rope to bind the victims, take the victims outside, and shoot them. However, Sylvester and O'Connor did not appear at the appointed hour that night. The defendants left after agreeing to postpone the killings until the following day. Carol Sylvester later spent the night with O'Connor at his house, but there is no indication that she divulged the above-mentioned plan of the defendants to shoot him.

Carol Sylvester also testified that, on the morning of October 8, 1984, the day of the homicides, she gave Andrews directions to O'Connor's house over the telephone. Andrews, however, insisted that she lure the victims to her house, as previously planned. That evening, Andrews, Cormier, and John Feroli, a codefendant in the first trial, arrived at Carol Sylvester's house with a handgun, a rifle, a knife, and a baseball bat. After the victims entered the house, the defendants and Feroli accosted them. Carol Sylvester then went into the bedroom. She testified that she had heard O'Connor say, "Why are you doing this to me . . . I didn't do anything to you," and heard Sylvester say, "It's cool, it's cool, you can take anything you want." She then heard Andrews say a few more words followed by shots and "gurgling noises." The three men left.

Shortly thereafter, Carol Sylvester telephoned the police. When the police arrived, she told them that three masked men had shot the victims. That same night, Andrews told Bolinder, according to her testimony, that he had killed the victims and would receive a life sentence if caught. Bolinder also testified that he had threatened to kill her or both of her children if she ever told anyone that he had killed the victims. Two days later, Andrews and Bolinder had an argument at her home, as a result of which Andrews slept in his automobile nearby, and Bolinder called the police. The officers spoke with Bolinder, observed Andrews in the vehicle, and searched him. They found a knife in his pocket. The officers then looked through the window of his automobile and observed and retrieved a

shortened baseball bat with a plastic strip around the end.[3] The next morning Carol Sylvester told the police that the three men had not been masked but were in fact the defendants and Feroli, all of whom were arrested immediately. Carol Sylvester was taken into protective custody, as was her sister Bolinder, and, once she was assured of immunity, she told the police about her role in the alleged events.

The defendants claimed separate alibi defenses for the night of the shooting. Feroli defended in the first trial on the ground that his participation in the alleged events was minimal. Feroli's retrial was severed from the defendants' second trial.[4]

1. *Double jeopardy.* The defendants assert that three aspects of the first trial should have barred the second trial. First, they claim that the judge erroneously refused to sever the trial of the former codefendant Feroli from their trial, despite Feroli's antagonistic defense. See *Commonwealth* v. *Moran,* 387 Mass. 644, 659 (1982). Second, the defendants claim that the trial judge made several erroneous and prejudicial evidentiary rulings. Third, they claim that shortly before trial a witness for the Commonwealth was placed in a cell with defendant Andrews in a calculated attempt by the Commonwealth to elicit threatening statements from Andrews.

The defendants do not claim any prejudice to the second trial as a result of the asserted infirmities in the first trial; and, as counsel for the defendant Andrews acknowledged in oral argument before this court, there could be no such prejudice shown on this record. The defendants also acknowledge that the first trial resulted in a mistrial because the jury could not reach any verdicts after several days of deliberation.[5] Prior to the second trial, the defendants filed motions to dismiss on double jeopardy grounds. These motions were denied. The defendants claim error, alleging that judicial and prosecutorial

---

[3] Carol Sylvester identified the knife and the modified baseball bat as Feroli's weapons.

[4] Feroli was convicted of murder on June 9, 1986, at a separate trial.

[5] On various occasions during the first trial, the defendants filed motions for mistrial, all of which were denied. The defendants do not challenge the judge's declaration of a mistrial when the jury deadlocked.

misconduct in the first trial led to a mistrial, and, hence, no second trial should have been permitted.[6]

In *United States* v. *Dinitz,* 424 U.S. 600, 606 (1976), the Supreme Court stated the fundamental precepts pertaining to claims of double jeopardy under the Fifth Amendment to the United States Constitution as follows:

> "Underlying this constitutional safeguard is the belief that 'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' *Green* v. *United States,* 355 U.S. 184, 187-188 [1957]."

Later, in the landmark case of *Oregon* v. *Kennedy,* 456 U.S. 667, 682-683 (1982), Justice Stevens, concurring, stated, as to cases involving mistrials:

> "Our decisions in the mistrial setting accordingly have accommodated the defendant's double jeopardy interests with legitimate prosecutorial interests.
>
> "The accommodation is reflected in two general rules that govern the permissibility of reprosecution after a mistrial. Which general rule applies turns on whether the defendant has retained control over the course to be followed once error has substantially tainted the initial proceeding. When a mistrial is declared over the defendant's objection, the general rule is that retrial is barred. An exception to this general rule exists for cases in which the mistrial was justified by 'manifest necessity.' The

---

[6] The defendants' arguments are based on Federal constitutional principles and on our common law decisions. We perceive, for purposes of this decision, no significant differences between State and Federal principles and thus do not treat separately State common law principles pertaining to double jeopardy.

other general rule is that the defendant's motion for, or consent to, a mistrial removes any double jeopardy bar to reprosecution. There is an exception to this rule for cases in which the prosecutor intended to provoke a mistrial or otherwise engaged in 'overreaching' or 'harassment.' " (Footnotes omitted.)

The Court, in *Kennedy,* described the concept of "overreaching" in these terms: "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 675-676. The defendants argue that they should prevail under this standard of prosecutorial overreaching, and they claim also that judicial misconduct occurred during the first trial.

The defendants overlook a number of fundamental principles. First, the double jeopardy clause does not ensure an error-free trial. *United States* v. *Jorn,* 400 U.S. 470, 484 (1971). Second, the burden is on the defendants to show judicial bad faith or prosecutorial "goading" or "overreaching." *Dinitz, supra* at 611. *Kennedy, supra* at 676. Next, this question is essentially a question of fact,[7] *Kennedy, supra* at 675, and no such finding was made, nor is it shown by the record. See *Dinitz, supra* at 611. Last, the mistrial here did not come about because of a motion by the defendants, but rather because the jury deadlocked, and, thus, the case falls not within the concept of a defendant being "goaded" by judicial or prosecutorial misconduct but rather within the "prototypical example" of a

---

[7] The case of *United States* v. *Kessler,* 530 F.2d 1246, 1256-1258 (5th Cir. 1976), on which the defendants rely, is inapposite. There, unlike here, the judge made an explicit finding of prejudice to the defendants arising from intentional prosecutorial misconduct.

mistrial caused by a "hung jury." *Kennedy, supra* at 672. In such circumstances, a retrial is permitted.

Our cases are in accord with the Federal principle. See, e.g., *Commonwealth* v. *Patten,* 401 Mass. 20, 23 (1987), (finding of no deliberate misconduct; retrial not barred); *Commonwealth* v. *Murchison,* 392 Mass. 273, 276 (1984) ("goading" must be shown, or irremediable harm to fair second trial). See also *Commonwealth* v. *Lam Hue To,* 391 Mass. 301, 312-314 (1984) (pretrial prosecutorial misconduct resulted in mistrial; dismissal not warranted absent showing that new trial could not be a fair trial). Cf. *Jones* v. *Commonwealth,* 379 Mass. 607, 618-619 (1980) (judge failed to consider alternatives to declaring mistrial based on his alleged misconduct during trial; reliance on defendant's withdrawn motion for mistrial as basis for claim of "manifest necessity" is misplaced).

There was no error in the denial of the defendants' motion to dismiss. We turn now to consider the various claims of error during the course of the second trial.

2. *Prosecutor's improper question as to the protected status of witness.* On direct examination, the prosecutor asked Carol Sylvester whether she gave some of the marihuana, given to her by Andrews, to another person. In response, she named an individual. The following colloquy then took place:

> THE PROSECUTOR: "Who is he?"
> THE WITNESS: "A State Trooper."
> THE PROSECUTOR: "Was he assigned to protect you?"
> THE WITNESS: "Yes."

The defense counsel timely objected, moved to strike, and moved for a mistrial. The judge denied the motions for mistrial but gave an immediate and forceful curative instruction. He stated that the jury were not "to draw any negative inference whatsoever" against the defendants, that the fact of protection was not "unusual" and that, "in most cases, and certainly in this case, [protection was] unrelated to any threats" by the defendants or others. There was no error in denying the motions for mistrial. Although the question arguably was improper, it does not warrant a mistrial.

Suggestions that a witness is under protective custody are ordinarily improper because they imply reasons for that protection that are not in evidence, such as threats by the defendant. *Commonwealth* v. *Winter,* 9 Mass. App. Ct. 512, 530-531 (1980). The defendants claim that the question was improper because it appears to have been designed to create an inference that one or both defendants had made threats against the witness. We note that there was evidence of such threats by the defendants against Carol Sylvester prior to, and after, the homicides. See *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 413-414 (1978) (where threats had been made against witness, such a question may be put). There was no error. Nevertheless, even if we assume that the question was improper, any prejudice was cured by the trial judge's immediate and detailed instruction. *Commonwealth* v. *Brown,* 376 Mass. 156, 165-166 (1978).

3. *Testimony of victim's mother.* The Commonwealth called O'Connor's mother as a witness, and, when asked to identify a photograph, she stated, "That's Billy. He's my son and my friend. He was a kind and beautiful person. Why did you kill him?" Both defendants immediately moved for a mistrial based not only on the witness's remark but also on the fact that she was called as a witness. The defendants asserted that identification of the victims was not an issue, that a photograph of O'Connor already had been accepted in evidence, and that the witness had been called in a calculated attempt by the Commonwealth to create sympathy in the minds of the jury. The judge denied the motions for a mistrial, but ordered the remark struck and instructed the jury to disregard it and to decide the issues on the evidence alone, rather than on sympathy or emotion. The defendants claim error in the denial of their motions for a mistrial.

We first address the defendants' claim that the witness should not have been called. There was no timely objection to her being called. Indeed, counsel for Cormier denied any claim that the prosecutor had called the witness for an improper purpose. Additionally, the record shows that the witness was

called to give relevant testimony explaining the significance
of a document in evidence.

On this appeal, the defendants state that they could have
stipulated as to the facts reflected by the document, and the
Commonwealth therefore had no need to call the witness. The
Commonwealth has a right to try its case in its own way so
long as it engages in no calculated impropriety. There is no
basis to conclude that the Commonwealth called the witness
improperly. See *Commonwealth* v. *Kane,* 388 Mass. 128
(1983).

We next turn to the defendants' objection to the Common-
wealth's having asked the witness to identify the photograph
of the victim. Although there was other evidence of identifica-
tion of the victim, there was no objection made to the question
as to identity. The objection raised addressed the witness's
spontaneous outburst only. That remark was struck. The judge
found, from the manner in which the remark was made and
from the demeanor of the witness, that the remark was not
calculated. The judge gave curative instructions immediately
and in his final charge. The judge's limiting instructions were
adequate to cure any undue prejudice from the witness's out-
burst. *Commonwealth* v. *Barbosa,* 399 Mass. 841, 849 (1987).

4. *Revelation by witness that the defendants had prior crim-
inal convictions.* On cross-examination, Bolinder was asked
whether she had been convicted of the crime of unlawfully
carrying of a firearm. She answered, "Yes, but I'm not the
one on trial for murder. Where's their records?" The judge
instructed the jury to disregard the remark and to consider only
the response of "Yes." Both defendants moved for a mistrial.
The motions were denied. There was no error.

As we noted in *Commonwealth* v. *Maguire,* 392 Mass. 466,
469-471 (1984), the revelation that a defendant has been con-
victed of a crime "may well divert the jury's attention from
the question of the defendant's guilt to the question of the
defendant's bad character." For two reasons, the dangers from
Bolinder's outburst are significantly less than the dangers that
we sought to guard against in *Maguire.*

In *Maguire,* we were concerned with the jury's confusion over the similarity of the defendant's prior conviction to the crime for which the defendant was on trial. In this case, however, Bolinder mentioned no specific crimes that could confuse the jury. Furthermore, this case concerns not the admission of evidence but the outburst of a witness, which the judge immediately instructed the jury to disregard. More analogous to Bolinder's outburst is the outburst in *Commonwealth* v. *Chubbuck,* 384 Mass. 746, 753 (1981), where the witness stated that the defendant, on trial for rape and murder, had threatened to kill him. We held in *Chubbuck* that the judge's instructions to the jury and his striking the witness's remark were sufficient to overcome any prejudice to the defendant. The same is true in the instant case. "[I]t must be presumed that in reaching the verdict, the jurors heeded the judge's instructions." *Commonwealth* v. *Fidler,* 377 Mass. 192, 199 (1979). Thus, there is no merit to the defendants' motion for a mistrial based on Bolinder's outburst.

5. *Testimony, instruction, and charge concerning former codefendant Feroli.* There was evidence that Andrews, Cormier, and Feroli were arrested at the same time and at the same place. There was also evidence that Feroli attempted to avoid arrest by fleeing, and that he gave a false name when arrested. No timely objection to the admission of this latter evidence was made. The defendants did object to the judge's instructions to the jury. Those instructions permitted the jurors to consider the evidence of flight and the giving of a false name as an inference of consciousness of guilt. They argue that, by the time of Feroli's flight and his use of a false name, any joint venture between them and Feroli had ended.

The defendants acknowledge that Feroli's flight and use of a false name were admissible to prove consciousness of guilt. *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 52 (1975). The defendants state, and we agree, that, if there were no joint venture, or if the joint venture had ended, then the actions of Feroli were not admissible against them. *Commonwealth* v. *Borans,* 379 Mass. 117, 145-148 (1979). Conversely, Feroli's actions could be considered by the jury if they were committed

during the course of the joint venture and in furtherance of it. *Id.* The judge so charged.[8] Thus, if the jury had some basis to find that there was a continuing joint venture to conceal the shootings, then Feroli's flight and use of a false name were admissible as evidence against the defendants herein. *Commonwealth* v. *Pringle,* 22 Mass. App. Ct. 746, 751-752 (1986).

The defendants argue, citing *Pringle, supra,* that their mere presence in the same location as Feroli at the time of arrest was an insufficient basis for the jury to find a continuing joint venture to conceal the shootings. In *Pringle,* it was held that the mere presence of both defendants at the time of the arrest could not establish a joint venture to conceal the crime, and therefore one defendant's use of a false name was admitted improperly against the other defendant. *Pringle* is distinguishable from the case before us, however, because there is additional evidence in this case from which the jury could infer that the defendants did have a joint venture to conceal the shootings. The evidence as to the sequence of arrests was not clear. It is inferable that Feroli's flight did not precede the arrest of Andrews and Cormier, and that, thus, it was for the jury to determine whether the joint enterprise was still in effect. The judge, in his charge, properly left this question to the jurors.[9] The jury could have found that Feroli's actions were

---

[8] At the time the evidence was received, the judge instructed the jury, in part: "[I]f you found . . . the flight . . . of Mr. Feroli . . . to be a consciousness of guilt [then] . . . that would only go to the possible culpability of Feroli. Now, if you found Mr. Feroli to be culpable, in other words, criminally responsible and a participant in causing the death of Mr. Sylvester and Mr. O'Connor or either one of them, as a joint venturer, which I will explain, then naturally that may assist you in your decision making process as to the two individuals who are on trial here today. But the consciousness of guilt . . . [of] Mr. Feroli . . . could not be used directly against either of the two defendants on trial here today."

[9] In his final instructions, the judge, having defined a joint venture, stated: "First, let me caution you, evidence of consciousness of guilt as it relates to Mr. Feroli can only run against Mr. Feroli. In other words, that would only go to show that he had a consciousness of guilt, if you find that to be the case. Now, the only time that evidence may assist you in the decision making process that relates to Mr. Andrews and Mr. Cormier would be if you were to find a joint venture between Mr. Andrews, Mr. Cormier, and Mr. Feroli, and therefore, in assessing what the culpability was of Mr. Feroli

committed during the course of a joint venture to conceal the shootings. The judge's instruction and charge concerning former codefendant Feroli were not error. See *Commonwealth v. Griffin,* 19 Mass. App. Ct. 174, 181 (1985).

6. *Admission of Carol Sylvester's handwritten notes.* Carol Sylvester was, of course, the major witness for the prosecution. Thus, the defense, as was its right, sought to impeach her credibility by a variety of means. Among these efforts to impeach her were questions on cross-examination designed to elicit admissions on the stand that she had lied to the police, had lied to the grand jury, and inferably, that she was lying at trial. As part of this effort, counsel for the defendant Andrews cross-examined Carol Sylvester about some handwritten notes she had made after her first interview with law enforcement officers. The notes were made prior to her grant of immunity and prior to her testimony before the grand jury. She testified that she had written them on her own initiative. Cross-examination addressed whether Carol Sylvester had been prompted by anyone to write the notes or had written them as an aid to her memory.

On direct examination of the police officer who had interviewed Carol Sylvester, the Commonwealth sought, in rebuttal, to have all the notes admitted in evidence on the basis that they were prior consistent statements. Counsel for the defendant Andrews objected that prior consistent statements are not admissible, absent a claim by the defense of recent contrivance. Defense counsel denied having made such a claim. The judge admitted the notes in their entirety and instructed the jury that they could look to the notes "only on the issue of whether or not [Carol Sylvester's] testimony was a recent contrivance or fabrication. And to some extent . . . as to whether there was any contest as to what she had said . . . or what occurred at any point in time."

in determining whether or not there was a joint venture, you may naturally use that evidence of consciousness of guilt that I've just referred to."

The judge also charged that, "[i]f several persons engage in a joint criminal undertaking or common enterprise, each is responsible for the acts of the other which occur during the pendency of the joint undertaking."

In *Commonwealth* v. *Zukoski,* 370 Mass. 23, 26-27 (1976), we stated the rule applicable as follows: "[A] witness's prior consistent statement is admissible where a claim is made that the witness's *in-court statement* is of recent contrivance or is the product of particular inducements or bias. . . . Unless admissible on some other ground to prove the truth of the facts asserted, such a prior consistent statement is admissible only to show that the witness's in-court testimony is not the product of the asserted inducement or bias or is not recently contrived as claimed. . . . *The trial judge has a range of discretion in determining whether a suggestion of recent contrivance exists in the circumstances.*" (Emphasis added and citations omitted.) The judge could have concluded, within his discretion, that the defendants had implied that Carol Sylvester was influenced to fabricate the version of events contained in her testimony, either by pressure from the police officers who interviewed her or by her desire to mask her complicity in the shootings, or by her desire to give testimony favorable to the prosecution because she had been given complete immunity from prosecution. The question whether a claim of recent contrivance was raised was within the sound discretion of the trial judge. *Commonwealth* v. *Zukoski, supra. Commonwealth* v. *Retkovitz,* 222 Mass. 245, 250 (1915). Ultimately, the issue was for the jury. *Commonwealth* v. *Pickles,* 364 Mass. 395, 401 (1973). Viewing the matter in the context of the entire evidence given by Carol Sylvester and the nature of the attacks on her credibility, we cannot say that the judge abused his discretion. See *Commonwealth* v. *Hoffer,* 375 Mass. 369, 376 (1978). There was no error.[10]

---

[10] The judge properly limited the evidence of the notes to the question of Carol Sylvester's credibility. See *Commonwealth* v. *Zukoski, supra* at 27. Even assuming that the admission of the notes was error, this is not a case like *Wilson* v. *Jeffrey,* 328 Mass. 192 (1951). In *Wilson,* we held that the admission of the prior consistent statement was highly prejudicial because it corroborated the testimony of the only witness. Here, the notes were cumulative. The testimony of Carol Sylvester was bolstered by the physical and documentary evidence, as well as by the testimony of Bolinder, neighbors, police officers, and others. The error, if any, does not require reversal.

7. *The defendants' prior convictions.* In their pro se brief, the defendants assert that the judge failed to exercise his discretion when he failed to allow a "motion to suppress" the record of their prior convictions. There is no support for this contention in the record. The judge stated that motions to exclude the defendants' prior convictions could be taken up during the course of the trial. We have indicated that "it is desirable, if feasible, that this [ruling] should occur at an early moment," *Commonwealth* v. *Diaz,* 383 Mass. 73, 81 (1981), but we have recognized that an advance ruling is not required. *Commonwealth* v. *King,* 391 Mass. 691, 695 (1984).

During the motion hearing, the judge stated that he did not have a record of Andrews' convictions and therefore could not then rule on the motion. When informed by counsel that one conviction of Andrews was for armed robbery, the judge stated that he would deny a motion to exclude that conviction. "If you're indicating an armed robbery, that he [Andrews was] convicted and [was] represented by counsel, I can indicate to you right now, that that aspect would be denied. If there are other convictions on this record, I'll rule on them." This statement is far from a failure to exercise discretion. As we construe the statement, the judge simply indicated a likely ruling, but he refused to rule until the defendants' records were before him. This course of action was within the judge's discretion. Cf. *Commonwealth* v. *Atkins,* 386 Mass. 593, 600 (1982).

The defendants argue in the alternative that, if the judge did exercise his discretion, he abused it. We have discussed the reasons for excluding evidence of prior convictions in conjunction with our discussion of Bolinder's revelation that the defendants had prior criminal convictions. An important factor, as enunciated in *Commonwealth* v. *Maguire,* 392 Mass. 466, 471 (1984), is the degree of similarity between the crimes of which a defendant had been convicted previously and the crime for which a defendant is being tried. In this case, Andrews's records, attached to the defendants' pro se brief, indicate that he had been convicted of armed robbery more than once. Andrews argues that this crime is substantially similar to the crime of felony-murder, in which the underlying felony is armed

robbery, and that it should have been excluded.[11] We disagree. There is a substantial difference between armed robbery and murder, even if that murder is committed in the course of armed robbery. *Commonwealth* v. *Fano,* 400 Mass. 296, 303-304 (1987) (armed robbery conviction need not be excluded where felony-murder not in issue). See *Commonwealth* v. *Walker,* 401 Mass. 338, 345 (1987) (at trial for murder, armed robbery, and unlawful carrying of firearm, judge did not abuse discretion in allowing use of record of prior convictions of larceny, robbery, and assault by means of a dangerous weapon. There was no error.

8. *Closing argument.* Both defendants claim that the prosecutor's closing argument was manifestly improper, and that a new trial is required because of it. Their arguments are that (1) the prosecutor twice asserted his personal belief as to the credibility of Carol Sylvester; and (2) he improperly referred to matters not in evidence. We have examined the contested portions of the argument and find the contentions of the defendants to be totally without merit. On both points, the prosecutor was seeking to press his view of the evidence and the credibility of the witnesses on the jury. In so doing, he was entitled to summarize the evidence and to draw fair inferences from it. *Commonwealth* v. *Lamrini,* 392 Mass. 427, 431-433 (1984). "Where credibility is at issue, it is certainly proper for counsel to argue from the evidence why a witness should be believed." *Commonwealth* v. *Thomas,* 401 Mass. 109, 116 (1987). None of the remarks of the prosecutor implied that he had personal knowledge on which he based his claims, as occurred in *Thomas. Id.* at 114-115 & n.6. Rather, the argument here was within the rule that " '[c]ounsel may "fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury." ' " *Commonwealth* v. *Ferreira,*

---

[11] In fact, the jury were not charged that they could convict the defendants based on felony-murder. The fact that the defendants did not inquire whether such a charge would be given belies their purported concern whether their prior convictions should have been excluded. See *Commonwealth* v. *Waters,* 399 Mass. 708, 716-717 (1987). It also belies their assertion that they would have testified, had they known that the jury would not be charged on felony-murder.

381 Mass. 306, 316 (1980), quoting *Commonwealth* v. *Haas,* 373 Mass. 545, 557 n.11 (1977) [*S.C.,* 398 Mass. 806 (1986)]." *Commonwealth* v. *Corriveau,* 396 Mass. 319, 336 (1985 ). There was no impropriety in the prosecutor's closing argument.

9. *Lack of charge on accomplice testimony.* Both defendants objected to the judge's failure to give a requested instruction on accomplice testimony pertaining to Carol Sylvester. The judge stated, "I'm satisfied that it's covered in the thrust of my remarks." In the circumstances of this case, we hold that there was no error.

We examine the judge's charge to the jury in its totality. *Commonwealth* v. *Sellon,* 380 Mass. 220, 233-234 (1980). In examining the charge, we also bear in mind that there is no error in the judge's failure to accept the wording suggested by counsel, *Commonwealth* v. *Silva,* 388 Mass. 495, 507 (1983), and that a charge on accomplice testimony is not constitutionally required, *Commonwealth* v. *Watkins,* 377 Mass. 385, 389-390, cert. denied, 442 U.S. 932 (1979).

We have held that it is appropriate to charge that the testimony of an accomplice must be corroborated in order to secure a conviction, but we have indicated that it may not be necessary for the jury to be so instructed. *Commonwealth* v. *Beal,* 314 Mass. 210, 232 (1943). We have held also that the judge should charge that the testimony of accomplices should be regarded with close scrutiny. *Commonwealth* v. *French,* 357 Mass. 356, 395-396 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972).

Here, the judge adequately charged on the issue of the need for corroboration of the testimony of Carol Sylvester because of the grant of immunity to her. The jury also were made aware of the need to regard Carol Sylvester's testimony with close scrutiny. The judge instructed: "You may consider whether the witness had any motive for testifying or interest or lack of interest in the outcome of this case. . . . You may test the evidence for any bias or prejudice or interest that the witness may have in the outcome of this case in determining

what credit and weight is to be given to the witness." Furthermore, throughout the trial the possible motives for Carol Sylvester to lie were vigorously explored. We have held that, when the witness's motives have been explored vigorously, no accomplice charge is required. *Commonwealth* v. *Allen,* 379 Mass. 564, 584-585 (1980). It is in the judge's discretion whether to rely on general instructions or to instruct more specifically. See *Commonwealth* v. *A Juvenile,* 21 Mass. App. Ct. 121, 124-125 (1985). There was no error.

10. *Other issues raised by the defendants.* We address the defendants' remaining arguments briefly.

a. On cross-examination, counsel for the defendant Andrews attempted to question Bolinder about her receipt of welfare payments while employed. The Commonwealth's objection was sustained. Both defendants claim on appeal that this ruling was error. We disagree. It is well established that impeachment by prior misconduct is not permissible. See P.J. Liacos, Massachusetts Evidence 147 (5th ed. 1981 & Supp. 1985), and cases cited. The defendants, however, argue for an exception to the rule, citing *Commonwealth* v. *Bohannon,* 376 Mass. 90 (1978), *S.C.,* 385 Mass. 733 (1982). *Bohannon* was a case in which the defendant was charged with rape. The defense was consent. We held it to be error to exclude evidence of the victim's prior false allegations of rape. In *Bohannon,* we made an exception to the general rule of exclusion as to prior acts of misconduct. The defendants allege no facts that would justify a similar exception.

b. The defendant Andrews produced several alibi witnesses. Dawn Squires testified that, at the time of the shootings, she had seen Andrews in her mother's kitchen. She testified that she did not know Andrews, nor, to her knowledge, did her mother, Rosemary Squires Clark. Dawn Squires also testified that her mother was selling a moped, and that she could conceive of no reason for Andrews's presence except to purchase the moped. In rebuttal, the Commonwealth produced the testimony of George Smart, Andrews's grandfather. Smart's testimony was shown on videotape because he was too ill to testify in court. The defendants objected solely on the ground

that the videotape evidence was not relevant. Smart's testimony was that Andrews had known Rosemary Squires Clark several years prior to the night in question. The evidence was clearly relevant to the issue of the credibility of Dawn Squires. There was no error.

c. The defendant Andrews claims error in the denial of his motion to suppress evidence seized from him, namely, the knife and bat used by Feroli on the night of the homicides. The judge found that this evidence was seized as a result of a complaint by Donna Bolinder in the early morning of October 11, 1984, that Andrews had threatened to kill her and her two children "just as he had killed two men in Plymouth." Andrews was found, as Bolinder said he would be, sleeping in his automobile nearby. The police had him leave the automobile, conducted a frisk, and found a knife. The judge found that the officers then observed a bat "in plain view" in the automobile, and seized it. The defendant was not arrested at that time.

The judge ruled that the initial frisk was justified under the "stop and frisk" doctrine enunciated in *Terry* v. *Ohio,* 392 U.S. 1, 29 (1968). See *Commonwealth* v. *Sumerlin,* 393 Mass. 127, 130 (1984), cert. denied, 469 U.S. 1193 (1985). The judge also ruled that the bat, seen through the automobile window, properly was seized as a dangerous weapon. See *Texas* v. *Brown,* 460 U.S. 730 (1983); *Commonwealth* v. *Irwin,* 391 Mass. 765 (1984).

The defendant Andrews does not challenge the judge's findings as "clearly erroneous." See *Irwin, supra* at 769. Rather, he claims that, absent an arrest, the search was illegal under the doctrine of *Commonwealth* v. *Toole,* 389 Mass. 159 (1983). The argument is without merit. In *Toole,* the court invalidated the seizure of a gun because the Commonwealth "has not shown that, when the search was conducted, the police reasonably believed that there was a connection between the vehicle and any criminal activity of the defendant, an essential element to a finding of probable cause." *Id.* at 163. Here, the judge ruled that Bolinder's statement to the officers about the threats on her life and about a prior double homicide "clearly justified the officer's actions." We agree. There was no error.

d. The defendant Cormier objected to certain testimony of Sergeant Daniel Lowney of the State police. Sergeant Lowney was recalled to rebut the alibi testimony of Edward Cormier, the defendant's brother. Edward Cormier had testified that on the night of the shootings the defendant had been working on an automobile at his house between 7 P.M. and 9 P.M. Sergeant Lowney testified that three days after the shootings he had informed Edward Cormier that his brother had been arrested and that the shootings had occurred the previous Monday evening. Sergeant Lowney testified that Edward Cormier did not inquire about the time the shooting had occurred and did not say anything about the defendant's whereabouts on that evening and, indeed, made statements consistent with a belief that his brother was guilty.

The defendant Cormier argues that his brother's purported statements are not inconsistent with his testimony and therefore are not admissible. The Commonwealth responds that Edward Cormier's failure to offer exculpatory information when it would have been natural to do so is akin to a witness's prior inconsistent statement and is therefore admissible. We agree that Edward Cormier's remarks are admissible. See *Commonwealth* v. *Hesketh,* 386 Mass. 153, 163 (1982); *Commonwealth* v. *Cefalo,* 381 Mass. 319, 337-338 (1980). Cf. *Commonwealth* v. *Nickerson,* 386 Mass. 54 (1982) (different rule may apply to defendant's failure to offer exculpatory information). The admission of Sergeant Lowney's testimony was within the sound discretion of the trial judge.

e. The defendant Cormier alleges error in the judge's restriction on his cross-examination of Carol Sylvester. Counsel states on appeal that he was attempting to show the motive or opportunity of persons other than the defendant to commit the killings. Counsel attempted to question Carol Sylvester as to whether she knew if Thomas Sylvester had been stabbed by his wife one month before the shootings. The judge carefully inquired of the witness whether she had any personal knowledge of the purported event, and, when told that she did not, he properly excluded her testimony as hearsay. Counsel also sought to question Carol Sylvester whether she had observed

her husband, from whom she was separated at the time, peering into the window of her home the evening before the shootings. The implicit value of such evidence might be to show the husband's jealousy of O'Connor, who was on intimate terms with Carol Sylvester, and the husband's anger toward his son, Thomas Sylvester, who had introduced O'Connor to Carol Sylvester. However, at the first trial of the defendants, Carol Sylvester had denied any knowledge of the purported event. The judge prohibited cross-examination on this point, stating: "The Commonwealth has the right to move in limine just as you do anticipating a question that might be clearly prejudicial and of no probative value. . . . That does not mean that if you have competent evidence to prove that point, that you can't present it." We agree. See *Commonwealth* v. *Lopez,* 383 Mass. 497, 500 n.2 (1981) (exclusion of evidence that may well have confused jurors).

f. The defendant Cormier challenges the admission in evidence of a gray, bloodstained jacket on the ground that the Commonwealth did not establish the chain of custody of the jacket. According to the testimony of the Commonwealth's witnesses, the jacket was taken from the apartment of the defendant's girl friend by a police officer, and it was given subsequently to a State chemist by a second police officer. Cormier claims that these facts establish an incomplete chain of custody. We note that Carol Sylvester identified the jacket as the one that she had observed the defendant Cormier wearing on the night of the shootings. This testimony was sufficient to authenticate the jacket, and there was no need to establish a chain of custody. See P.J. Liacos, Massachusetts Evidence 394 (5th ed. 1981 & Supp. 1985), and cases cited.

The brief for the defendant Cormier can be read also to assert an incomplete chain of custody for the blood samples taken from the jacket. Cormier failed to object to the chemist's testimony at trial. We therefore consider whether there is a substantial likelihood that a miscarriage of justice has occurred. G. L. c. 278, § 33E (1986 ed.). See *Commonwealth* v. *Mahdi,* 388 Mass. 679, 690 [1983], and cases cited. We hold that the blood from the jacket was authenticated sufficiently for testimony

concerning it to be admitted, and therefore there was no substantial likelihood of a miscarriage of justice.

The Commonwealth need not have taken the jacket directly from the defendant or from his apartment in order to authenticate the blood samples taken from it, as the defendant Cormier asserts. *Commonwealth* v. *Drayton,* 386 Mass. 39, 47-48 (1982). The lack of testimony about how the jacket was conveyed from one police officer to another affects the weight of the evidence, not its admissibility. *Commonwealth* v. *Berth,* 385 Mass. 784, 791 (1982).

g. Counsel for the defendant Cormier asserted at trial that the investigation of the blood type of the blood samples taken from the gray jacket was inadequate. The evidence showed, however, that the Commonwealth had transmitted the relevant blood samples to the Federal Bureau of Investigation (FBI). The FBI reported its effort to type the blood as "inconclusive." Counsel also argued that the failure of the police investigation to seek further evidence linking his client to the shootings, such as fibers from the scene of the shootings, was a weakness in the Commonwealth's case.

Counsel requested a jury instruction, citing *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980), that "failure of the police investigators to follow recognized procedures or their failure to perform or follow-through on recognized police procedures can establish reasonable doubt." The judge denied the requested instruction. There was no evidence which raised the issue of police "failure" to conduct tests. See *id.* at 485.

The defendant was given an opportunity to cross-examine the police officers and the State chemist thoroughly about any investigative procedure not used. See *Commonwealth* v. *Flanagan,* 20 Mass. App. Ct. 472, 475 (1985). However, it does not follow that he was entitled to an instruction such as the one requested. Additionally, this is not a case, like *Bowden, supra,* in which the judge charged the jury that the failure to conduct certain tests was *not* to be considered as evidence. The judge was well within his discretion in refusing to give the requested instruction.

11. *Review of entire record.* We have reviewed carefully the entire record, as is our duty under G. L. c. 278, § 33E, and we find no reason to disturb the verdicts. The defendants assert that, even if the individual errors do not warrant a mistrial, the combination does. See *Commonwealth* v. *Cancel,* 394 Mass. 567, 576 (1985). However, based on our review of the asserted errors and of the record, we conclude there was little error and, certainly, no prejudice. Additionally, we see no reason to disturb the verdicts rendered by the jury.

*Judgments affirmed.*