# United States Court of Appeals

## For the First Circuit

No. 02-1244

DONALD N. CREIGHTON,

Petitioner, Appellant,

v.

TIMOTHY HALL, SUPERINTENDENT OF MCI NORFOLK;
THOMAS REILLY, ATTORNEY GENERAL OF MASSACHUSETTS,

Respondents, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Circuit Judge,
B. Fletcher,* Senior Circuit Judge,
and Stahl, Senior Circuit Judge.

Greg T. Schubert for appellant.
James J. Arguin, Assistant Attorney General, with whom Thomas
F. Reilly, Attorney General, was on brief for appellees.

November 6, 2002

_____
*Hon. Betty B. Fletcher, of the Ninth Circuit, sitting by
designation.

**STAHL**, **Senior Circuit Judge**.  This is an appeal from an order of the United States District Court for the District of Massachusetts, entered on February 13, 2002, denying Donald Creighton's petition for habeas relief under 28 U.S.C. § 2254. After a Massachusetts Superior Court judge declared a mistrial, Creighton was retried by a newly impaneled jury and convicted of rape, kidnapping, and assault and battery.  He asserts that the second trial and the resulting convictions violated his federal constitutional right against double jeopardy.  Both the state Superior and Appellate Courts held that the second trial and ultimate convictions were not barred by the double jeopardy clause. Applying the highly deferential standard of review prescribed by AEDPA, we affirm.

## I

On October 15, 1992, a grand jury indicted Creighton for rape, kidnapping, and assault and battery.  Creighton's jury trial began on January 27, 1993.  On direct examination, the victim testified that Creighton held her against her will in his apartment, beat her with his fists, slapped her repeatedly, and then raped her.  On cross-examination, after the victim denied being under the influence of any substance on the day in question, the court sustained an objection to defense counsel's question regarding the last time she had been under the influence of a substance.  The victim also testified that the medical examination

-2-

performed on her the night of her alleged rape indicated that the physician had found no bruises.

Creighton testified in his own defense. On direct examination, he testified that he and the victim had engaged in consensual intercourse, after which she demanded $300. He denied ever holding the victim against her will or abusing her in any way. He also testified that after he refused to pay her, she threatened to accuse him of rape and to return with a male friend presumably to obtain the money. Approximately twenty minutes after the victim departed, Creighton left his apartment.

On cross-examination, after the prosecutor asked Creighton about why he left his apartment after the incident, the following exchange occurred:

Prosecutor: Were you afraid these people were going to come back and get you, is that why you left?
Creighton: I had mixed feelings. You know, I felt very much -- I felt that I was in the dark. You know, I felt that I was deceived.
Prosecutor: Yes?
Creighton: You know I didn't know what her motives were.
Prosecutor: Sure?
Creighton: I didn't know, at this time, that she used drugs. She shot heroin and stuff.[1]
Prosecutor: You didn't know that, no?
Creighton: No.

The prosecutor returned to her initial question of whether Creighton had left because he was afraid of something.

---

[1]At the probable cause hearing, the victim acknowledged using heroin roughly three times a week but denied using heroin on the day of the alleged incident.

After Creighton's response, the court <u>sua</u> <u>sponte</u> provided the following curative instruction: "Let me just tell the Jury, on that reference, to the use of drugs.  There's absolutely no evidence that the alleged victim in this case, used or uses drugs, and you are to disregard that, and you're not to mention that in your deliberations.  Go ahead."

The following colloquy then occurred:

```
Prosecutor:     Thank you.
Creighton:      There's testimony --
The Court:      Hold on.  Wait a minute, Mr. Creighton.
Creighton:      -- there's testimony of probable cause --
The Court:      Mr. Creighton, stop it.  Stop it!
Creighton:      -- that she used drugs.
The Court:      Okay.  Bring him out right now and the jury may
                be excused.
Creighton:      You just don't want the jury to know --
The Court:      Mistrial.
Creighton:      -- like she was.
```

The transcript quoted above fails to fully depict what occurred in the courtroom.  An audiotape of the proceedings, which is part of the record, reveals that as Creighton continued to speak over the court's instructions not to do so, the trial judge's voice became progressively louder, and, at one point, she banged her fist on the bench.  Her last "Stop it" was considerably louder than her previous declarations and voiced in a high-pitched, excited tone.

After ordering the mistrial and as she headed for chambers, she held Creighton in contempt of court.  Two minutes after departing the courtroom, the judge returned and, in Creighton's but not the jury's presence, stated: "Okay, I said the

-4-

word mistrial, but I don't think the Jury knows what I meant by that. I'd just as soon continue with this case and with this Jury, unless there's an objection and somebody moves for a mistrial." After conferring with Creighton, defense counsel moved for a mistrial, explaining that although he "underst[ood] that [the declaration of mistrial] was as the result of the conduct of [his] client," he believed that the declaration coupled with Creighton being held in contempt of court in front of the jury prejudiced the jury against Creighton and no instruction would remove that prejudice. The trial judge agreed and granted Creighton's request for a mistrial and admonished Creighton not to let it happen again. Creighton attempted to respond, but this time he heeded her directive to stop. She then called back the jury and discharged them from the case.

The following Monday, Creighton moved to dismiss the indictments against him on the ground that a retrial would be barred by the double jeopardy clause, and moved to recuse the judge from presiding over the second trial. The court denied both motions.

Seeking review of his motion to dismiss, Creighton moved to stay the second trial and filed a petition, under Mass. Gen. Law ch. 211, § 3, along with the audiotape of the relevant portion of the trial proceedings, to the single justice of the Massachusetts Supreme Judicial Court ("SJC"). After a hearing, the single

justice denied the petition. No appeal was taken to the full court. Commonwealth v. Creighton, 666 N.E.2d 1298, 1298 (Mass. 1996).

Creighton was subsequently retried by a newly impaneled jury, with the same Superior Court judge presiding, and convicted of rape, kidnapping, and assault and battery.

## II

### A. Reconsideration of First Petition to Dismiss

On June 16, 1995, Creighton filed a second petition to the single justice of the SJC, seeking reconsideration of the denial of his first petition. The single justice again denied relief. The SJC affirmed that decision on the procedural ground that Creighton had failed to appeal the denial of his initial petition. In January 1997, Creighton filed a motion for release from illegal incarceration, pursuant to Mass. Crim. Pro. R. 30[a], arguing that the second trial was barred by double jeopardy. After a hearing the Superior Court denied this motion.

### B. Direct Appeal

Creighton appealed his convictions and the Superior Court's denial of his motion for release from illegal incarceration to the Massachusetts Appeals Court. The Appeals Court affirmed the underlying convictions and the denial of his motion for a new trial. See Commonwealth v. Creighton, No. 96-P-1898 (Mass. App. Ct. Aug. 6, 1998) (unpublished opinion). It held that the manifest

necessity test did not apply in these circumstances because although the trial judge first said "mistrial," Creighton effectively "pulled the plug" on the first trial by requesting the mistrial.  Id. at 1-2.[2]  The court rejected Creighton's claim that the manifest necessity test should apply because he had no opportunity to consent to the trial court's sua sponte declaration of mistrial before she "'rushed from the bench,'" reasoning that the trial judge was entitled to "cool off," and, in any case, the judge returned and gave Creighton a full opportunity to be heard. Id. at 2-3.  Finally, finding that the trial judge's "conduct did not evidence any bad faith," the court rejected Creighton's contention that the record demonstrated that the trial judge had "'lied'" to the jury or acted in such a way as to bar a retrial. Id. at 1 (citing United States v. Dinitz, 424 U.S. 600, 611

_____

[2]The court explained:

> When the judge returned to the bench--having stifled [Creighton]'s attempt inappropriately to sully the victim's reputation--her inclination to continue the trial with the same jury was ill-advised.  However, although it was the judge who first uttered the word "mistrial," it was defense counsel who pulled the plug and urged the declaration of a mistrial.  In these circumstances, we need not apply the manifest necessity test.  Where the defendant originates the request for a mistrial or expresses agreement with the idea, ordinarily double jeopardy will not prevent a retrial.

Id. at 2 (citations omitted).

(1976)).  Finally, the Appeals Court rejected Creighton's challenge to the trial judge's sua sponte instruction to the jury regarding the victim's alleged drug use, explaining that these "inappropriate remarks were made on cross-examination and that his answers contained information which the judge considered both nonresponsive and inadmissible."  Id. at 3 (citations omitted).  His application for further appellate review to the SJC was denied on October 27, 1998.

C.      **District Court's Memorandum of Decision**

After exhausting his state remedies, Creighton timely filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that his convictions after the second trial violated his federal constitutional right against double jeopardy. Creighton v. Hall, No. Civ.A. 99-12215, 2002 WL 745843 (D. Mass. February 12, 2002).  In dismissing the petition, the district court held that the state court's denial of Creighton's double jeopardy claim was not contrary to, or a result of an unreasonable application of, clearly established Supreme Court precedent.  The court agreed that Creighton had "pulled the plug" on the first trial by requesting the mistrial and, thus, the manifest necessity test did not apply.  The court also held that Creighton had failed to rebut by clear and convincing evidence the state court's factual determination that the trial judge's conduct did not evidence bad faith.

Creighton filed a timely notice of appeal on February 26, 2002.

**III**

We review the federal district court's denial of a writ of habeas corpus de novo. See Almanzar v. Maloney, 281 F.3d 300, 303 (1st Cir. 2002).

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") significantly limits the scope of federal habeas review. AEDPA precludes the granting of habeas relief to a state prisoner, unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is "contrary to" federal law if the state court applies a legal principle different from the governing principal set forth in Supreme Court cases, or if the state court decides the case differently from a Supreme Court case on materially indistinguishable facts. Bell v. Cone, 122 S.Ct. 1843, 1850, ___ U.S. ___ (2002) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000)).

To hold that a state court's decision is an "unreasonable application" of clearly established federal law, the federal habeas court must find that "the state court correctly identifie[d] the governing legal principle from [Supreme Court] decisions but unreasonably applie[d] it to the facts of the particular case."

Bell, 122 S.Ct. at 1850. In making this determination, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. We are mindful that in order to grant habeas relief the state court decision must be objectively unreasonable as opposed to merely incorrect. Williams, 529 U.S. at 411 ("A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."). Finally, our focus "is not how well reasoned the state court decision is, but whether the outcome is reasonable." Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001), cert. denied, 122 S.Ct. 282 (2001).

AEDPA also provides habeas relief when the state court decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, the federal habeas court shall presume that the state court's determination of factual issues is correct and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1).

**IV**

With this framework in mind, we turn now to Creighton's claims. Creighton maintains that the Double Jeopardy Clause barred his retrial because the court declared the mistrial <u>sua</u> <u>sponte</u> absent manifest necessity and, alternatively, the trial judge's conduct was intended to provoke Creighton to request a mistrial.

**A.        Clearly Established Federal Law**

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant against "repeated prosecutions for the same offense" and affords the defendant the right "'to have his trial completed by a particular tribunal.'" <u>United States</u> v. <u>Dinitz</u>, 424 U.S. 600, 606 (1976) (quoting <u>Wade</u> v. <u>Hunter</u>, 336 U.S. 684, 689 (1949)); <u>see</u> <u>also</u> <u>Oregon</u> v. <u>Kennedy</u>, 456 U.S. 667, 671 (1982).  The Supreme Court has directly addressed the double jeopardy implications of a trial court's <u>sua</u> <u>sponte</u> declaration of a mistrial.  If a judge declares a mistrial over the objection of the defendant, a retrial will be barred unless the mistrial was justified by manifest necessity.  <u>Kennedy</u>, 456 U.S. at 672; <u>Dinitz</u>, 424 U.S. at 606-607.  If, on the other hand, a defendant requests or consents to a mistrial, the "manifest necessity" standard does not apply and the Double Jeopardy Clause ordinarily will not bar retrial, even when the request or consent to a mistrial is in response to prosecutorial or judicial error.  <u>Kennedy</u>, 456 U.S. at 672-73; <u>Dinitz</u>, 424 U.S. at 607-10.  The Supreme Court, in <u>Dinitz</u>,

made clear that "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such [judicial or prosecutorial] error." 424 U.S. at 609. However, the Supreme Court has recognized a narrow exception to this rule: A retrial will be barred where the defendant's request or consent to a mistrial is necessitated by judicial or prosecutorial conduct "intended to provoke the defendant into moving for a mistrial." Kennedy, 456 U.S. at 679.

With these principles in mind, we look to the state court's decision and ask whether the decision was contrary to, or an objectively unreasonable application of, the above-mentioned Supreme Court precedents.

B.        **Contrary To Clearly Established Federal Law**

We can easily dispose of the "contrary to" prong as we find that the Appeals Court correctly identified the legal principles set forth in Dinitz and its progeny as governing the merits of Creighton's double jeopardy claim. Although the Appeals Court relied heavily on state court decisions, those decisions relied directly upon Supreme Court precedent, including Dinitz, for the legal principles outlined above. See, e.g., Commonwealth v. Andrews, 530 N.E.2d 1222, 1225-26 (1988) (citing Dinitz, 424 U.S. 600); Jones v. Commonwealth, 397 N.E.2d 1187, 1192 (1979) (rev'd on other grounds, 400 N.E.2d 242 (Mass. 1980)). Moreover, the Appeals

-12-

Court itself cited to Dinitz in the portion of its opinion addressing the applicability of the bad faith exception. Finally, we have found no Supreme Court case with facts "materially indistinguishable" from those in the case before us. We hold, therefore, that the state court's decision was not "contrary to" clearly established federal law.

**C.      Unreasonable Application of Clearly Established Federal Law**

We also conclude that the state court's decision did not result from an objectively unreasonable application of clearly established Supreme Court precedent.[3]  We reiterate that the key issue for double jeopardy purposes "is that the defendant retain primary control over the course to be followed in the event of" judicial error that necessitates a mistrial. Dinitz, 424 U.S. at 609.  Here, two minutes after sua sponte declaring a mistrial and leaving the courtroom, but before discharging the jury, the trial judge returned to the courtroom and stated her desire to continue with the first trial unless either party objected to continuing or requested a mistrial.  After conferring with his client, Creighton's trial counsel availed himself of this opportunity and requested a mistrial.  Thus for double jeopardy purposes, Creighton

---

[3]Although it appears that the Appeals Court might have held, in the alternative, that there was manifest necessity to declare a mistrial, we need not reach that question because we find that the state court reasonably concluded that Creighton requested the mistrial and found that the trial judge's conduct did not evidence bad faith.

-13-

had a choice "over the course to be followed" in his prosecution. He could either have taken his chances with the first trial, the possibility of a reversal on appeal if convicted, and a subsequent retrial, or he could, as he did, have ended the first trial. The choice was his to make. Because the trial judge returned to the bench and provided Creighton with an opportunity to be heard before the jury was discharged, we cannot say that the Appeals Court decision resulted from an objectively unreasonable application of Dinitz and its progeny.

In response, Creighton raises two arguments, neither of which we find persuasive. First he argues that because he had no meaningful opportunity to object or consent to a mistrial before the trial judge "rushed from the bench," the Appeals Court unreasonably held that the manifest necessity test did not apply. According to Creighton, the mistrial was a fait accompli the moment the trial judge left the courtroom and, accordingly, his request for a mistrial after she returned is without legal significance.

We disagree. Not only does Creighton fail to cite to any Supreme Court cases, and we have found none, supporting this proposition, he also fails to explain why the trial judge's departure is dispositive. Insofar as he contends that the court's utterance is somehow talismanic or that the court lacks jurisdiction or discretion to reconsider her order of mistrial once she left the courtroom, existing federal case law supports the

-14-

opposite conclusion.[4]  See, e.g., United States v. Segura-Gallegos, 41 F.3d 1266, 1271 (9th Cir. 1994) (holding that no error occurred where the trial court reconsidered and reversed its order of mistrial because "[u]ntil the jury is excused, the court may reconsider its intention to declare a mistrial") (citing United States v. Smith 621 F.2d 350, 352 n.2 (9th Cir. 1980), cert. denied, 449 U.S. 1087 (1981)); Cambden v. Circuit Ct. of 2nd Judicial Cir., 892 F.2d 610, 617 n.7 (7th Cir. 1989) ("While the mistrial declaration alone was not a talismanic utterance, the discharge and dispersal of the jury rendered the mistrial a *fait accompli*."), cert. denied, 495 U.S. 921 (1990)); c.f. United States v. DiPietro, 936 F.2d 6, 11 (1st Cir. 1991) (in holding that mere silence constitutes tacit consent to a mistrial where the defendant failed to object to a sua sponte declaration of mistrial, the court explained that, even though the jury had been dismissed when the mistrial was declared, "the court could have asked the jury to remain while reconsidering its decision."). The federal cases relied upon by Creighton do not hold otherwise and are all factually distinguishable as the defendants in those cases were not

---

[4]Although the "Supreme Court has made clear . . . that AEDPA precludes federal courts from disturbing state court judgments by relying on precedents created by federal courts of appeals," Almanzar, 281 F.3d at 304 n.3, reference to factually similar cases from inferior federal courts is appropriate in assessing the reasonableness of a state court's application "when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns." Rashad v. Walsh, 300 F.3d 27, 35 (2002).

provided with an opportunity to object or consent to a mistrial. Lovinger, 845 F.2d 739; Brady v. Samah, 667 F.2d 224 (1st Cir. 1981). Given that the trial judge had not discharged the jury and that she returned and provided Creighton with an opportunity to request a mistrial, we do not see how the fact that the trial judge left the courtroom for a short recess affects the issue here: Whether Creighton "retained primary control over the course to be followed" in his case. In any case, we cannot say that it was an objectively unreasonable application of Dinitz and its progeny for the Appeals Court to conclude that the trial judge could take a recess to "cool off" and return, at which time she could reconsider her motion and provide defendant with an opportunity to be heard.

In the alternative, Creighton secondly contends that he did not voluntarily request a mistrial because the trial judge's conduct forced him to a "Hobson's choice," and, therefore, his request for a mistrial has no legal significance. This very argument was raised and rejected in Dinitz and thus we find that Creighton's argument is without merit. 424 U.S. at 609-10.

In sum, the Appeals Court reasonably concluded that because Creighton had an opportunity to request a mistrial and did so, the manifest necessity test did not apply and retrial was not barred absent a finding of judicial conduct intended to provoke Creighton into requesting a mistrial.

**D.      Unreasonable Determination of the Facts**

Finally, Creighton challenges the Appeals Court's factual determination that the trial judge's conduct did not evidence bad faith. We reiterate that Creighton must clear a high hurdle before we will set aside the Appeals Court's factual determination: He must rebut the presumption of correctness of the Appeals Court's factual determination by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). After reviewing the record thoroughly and listening to the audiotape, the most that we can say is that the trial judge became excited only <u>after</u> Creighton failed to stop speaking over the court's repeated instructions not to do so.

Even were we to accept Creighton's view that the court's instruction to the jury to disregard his testimony regarding the victim's alleged drug use was improper, which we doubt, it is pure speculation that the court gave the instruction with the intent to provoke the mistrial. Creighton contends that throughout the trial, the trial court had aligned itself with the prosecution to convict him. He claimed this was evidenced by the court's prejudiced evidentiary rulings and its attack on his credibility through its <u>sua</u> <u>sponte</u> jury instruction, all brought about by the court's realization that the Commonwealth would lose its case due to the victim's inconsistent testimony. There is no support for this in the record; in fact, the opposite appears to be true. To support his theory, Creighton claims that the trial court deprived

-17-

him of the use of the victim's medical examination, which would have shown that he did not ejaculate during intercourse and that he did not beat or slap her. However, Creighton himself testified that he did, in fact, ejaculate during intercourse with the victim, and the victim herself testified that her medical examination indicated that no bruises were found. Even more damning, Creighton's defense counsel rejected the Commonwealth's offer to admit the victim's medical examination. And when asked by the court whether he planned on introducing the victim's medical examination, the defense counsel said "no."

Moreover, Creighton's allegations of judicial bias are belied by the court's numerous evidentiary rulings made in his favor over the Commonwealth's objections. For example, on the morning of the mistrial, the court ruled, over the Commonwealth's repeated objections, that defense counsel would be permitted to call Dr. DeFazio, the doctor who examined the victim after the alleged rape, to testify regarding the results of the Johnson Rape Kit and to impeach the victim's testimony that she did not have intercourse that day. The court also ruled that the victim could be recalled to the stand to be impeached with her prior prostitution charge. In addition, the record reflects that the judge had permitted defense counsel, on cross examination, to impeach the victim's credibility with a number of her prior convictions.

-18-

In sum, Creighton has pointed to no evidence in the record that compels us to conclude that the trial judge acted in bad faith with intent to provoke him to request a mistrial.

**V**

We are not without concern about the circumstances of this case. Creighton had little choice but to request a mistrial after his sparring match with the court that took place in front of the jury. However, under 28 U.S.C. § 2254, it is immaterial whether we would have, in the first instance, decided the case differently. See Williams, 529 U.S. at 411. We only need to conclude, as we do, that the Appeals Court applied the principles identified in Dinitz to the facts of this case in an objectively reasonable manner. Finding that the state court decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, we affirm.