COMMONWEALTH vs. LEON R. GALLEGO.

No. 88-P-1316.

Suffolk. May 16, 1989. — August 18, 1989.

Present: BROWN, KAPLAN, & DREBEN, JJ.

*Controlled Substances. Practice, Criminal,* Argument by prosecutor.

At the trial of an indictment charging trafficking in cocaine, the prosecutor's
improper attempt to sway the jury toward conviction by her argument
of extraneous matters appealing to public anxiety about drug trafficking
and her insinuations that tried to take advantage of ethnic or national
prejudice required that the defendant be given a new trial. [717-720]

INDICTMENT found and returned in the Superior Court Department on September 21, 1987.

The case was tried before *Walter E. Steele*, J.

*Robert S. Sinsheimer* (*Edward T. Dangel, III*, with him) for the defendant.

*Daniel M. Marposon*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Because of overreaching by the prosecutor, the verdict will be set aside and the case remanded for retrial.

We summarize the testimony and then deal with the prosecutor's conduct.

1. The indictment charged the defendant Gallego with cocaine "trafficking" (G. L. c. 94C, § 31) on July 2, 1987.

The Commonwealth's case ran thus. One Steven Mendoza, a long time, paid, undercover "cooperating individual" for the Federal Drug Enforcement Administration (DEA) and the Boston police, on May 6, 1987, was visiting at the Las Palmas restaurant in Chelsea. This was suspected of being a center for the activities of Walter Arengo and Vicente Bettencourt, allegedly distributors connected with an important cocaine source. At a table with Mendoza were a group including Arengo

and Romero Lopez, also an undercover informant. The defendant, present in the restaurant, came over to greet Lopez, whom he knew as a friend. He joined the table and, hearing talk of Mendoza buying cocaine from Arengo at $900 an ounce, said, in Mendoza's words, "he could do something for me," or "could do, you know, some 'coke' for me." He wrote a telephone number and "1976 Pontiac" on a napkin and handed the napkin to Mendoza.

On July 2, 1987, at 12:45 P.M., Mendoza and Lopez were standing outside the Sullivan bar in Chelsea. Arengo had failed to show up earlier, breaking his agreement with Mendoza. At that point, the defendant appeared and "inserted himself." Told that Arengo was to deliver a kilo for $25,000, the defendant said he could offer a half kilo for $12,500, and another half kilo later, the first buy to occur at Copley Square in a half hour. Mendoza agreed.

Mendoza and Lopez went to the DEA office in the Kennedy building in Boston. DEA officers searched the two informants, as well as Mendoza's car, in which they were to proceed, and found all clean of drugs. Then Mendoza and Lopez drove to the Copley Square area, followed for surveillance in another car by special DEA agent John Fencer, Boston police detective John Honen, and a third officer. The defendant was waiting on foot at a curb. He entered Mendoza's car, which was driven close to the defendant's car, parked nearby. Mendoza parked his car, and he and Lopez and the defendant started to walk toward the defendant's car. Midway, the defendant asked Mendoza whether he had the money with him, and in feigned response Mendoza walked, unaccompanied, back to his car. He opened the hatchback and (unseen by the defendant) withdrew a .22 caliber pistol, which he tucked in at his waist; in fact he had no money besides a few bills. He rejoined the defendant and Lopez. Arriving at the defendant's car, the defendant took the driver's seat, Mendoza the passenger's. Lopez remained outside. The defendant opened the glove compartment with a key and took out a Dunkin Donuts bag and handed it to Mendoza. Mendoza saw inside a plastic bag and white powder, recognizably cocaine. (There were four smaller bags

within the plastic bag.) Mendoza displayed the Dunkin Donuts bag so that Honen, who was observing at a distance, began to close in to make the arrest. Mendoza saw the defendant make a move to the floor of the car, whereupon Mendoza drew his gun. Honen made the arrest. A screwdriver was found under the driver's seat. Neither Honen nor the other officers had actually seen a transfer of the drug from the defendant to Mendoza; this stood on Mendoza's testimony. Lopez was not called. The powder in the bags weighed approximately one-half kilogram and assayed as 88-93 percent pure cocaine hydrochloride.

The foregoing came out through testimony by Mendoza, Fencer, and Honen.

The defendant took the stand. He was twenty-eight years of age, was born in Colombia, and came to this country in February, 1986, for "working reasons." He was married to an American national; they had two children and lived with the defendant's in-laws in Warren in western Massachusetts. However, he worked in East Boston at an "auto-body" shop, and took meals sometimes at Las Palmas, where they served familiar food. Mendoza, to whom he had been introduced by Lopez, said he could get him a Pontiac in Springfield at a low price; hence the napkin. Coming out of a bakery shop in Chelsea on July 2, he met Mendoza, and he was at Copley Square in Mendoza's car that day to go with Mendoza and Lopez to Springfield to pursue job opportunities there for himself and Lopez. Because Mendoza's car could not make the trip, they were changing to the defendant's car. Mendoza returned to his car for a moment to lock it. When the defendant and Mendoza took their seats in the defendant's car, Mendoza, to the defendant's consternation, declared himself, produced a gun and, under threats, tried to get the defendant's help in the cocaine investigation. After arrest, the defendant was taken to a police station and shown a drug bought, the officers said, from Arengo. He was threatened with jail if he did not cooperate, but refused to act as the officers demanded.

The Commonwealth chose not to cross-examine the defendant; and so the trial proper ended.

Commonwealth *v*. Gallego.

2. On the testimony itself, the jury could believe the Commonwealth's story and disbelieve the defendant's and bring in a guilty verdict. This is not disputed. What invalidates the verdict is the prosecutor's illegal attempt to sway the jury toward conviction by extraneous matters and prejudicial insinuations.

The main faults lie in the prosecutor's closing speech to the jury. The defendant had testified, in effect, that he was set up by the inveterate informer, Mendoza. That was his defense. Instead of making any direct attack on the defendant's testimony, e.g., by cross-examining him, the prosecutor in closing appealed to the deep public anxiety about the drug problem as a means of countering and ridiculing the idea of a manufactured case. Why, she said, would the police cook a case of drug trafficking when there were cases for easy prosecution in masses on the city streets? She said: "[W]ith the number of cases that are literally lying on — not lying on the street — standing on the streets of Boston, operating out of apartments in Boston, do the Boston Police, do DEA agents have to frame people? Do they have to set people up? There's enough cases out there to keep them all busy many times over. They simply don't have the time, I would suggest to you, or the interest in Mr. Gallego such as they're going to set him up and the story that he told you. And then I'm asking you, of course, just to discredit completely what he said." Here the prosecutor departed from *this* case, where she belonged, to invoke supposed facts which were not only extraneous but carried the emotional charge of an overwhelming drug menace. See *Commonwealth* v. *Burke*, 373 Mass. 569, 574-575 (1977); *Commonwealth* v. *Smith*, 387 Mass. 900, 905-906 (1983); *Commonwealth* v. *Clary*, 388 Mass. 583, 590 (1983). Cf. *Commonwealth* v. *Kozec*, 399 Mass. 514, 522-526 (1987).

The defendant was Colombian[1] and the prosecutor sought to link him to other Colombians, Arengo and Bettencourt. What legitimate probative purpose could be served by emphasis on Colombia? None.

---

[1] The prosecutor took pains during Honen's testimony to prove this from the booking record made when the defendant was taken to the police station.

Yet, in justifying Mendoza's possession and use of a gun, the prosecutor said in closing: "We're talking, ladies and gentlemen, Colombian drug dealers. We're talking a lot of money and a lot of cocaine and the stakes are high. I'm asking you not to hold it against Mr. Mendoza that he appeared with a gun there, and with the full knowledge of DEA as well. Basically, I'm asking you to look at the type of crime that you have here, at the inability of ordinary police officers who do not speak Spanish — and even Spanish speaking officers' covers get blown eventually — to penetrate this type of organization, a tightly knit organization of Colombians operating out of a restaurant in Chelsea. And how is the government going to get in there?"

"We're talking . . . Colombian drug dealers," and so forth, suggested that Colombian drug dealers are more dangerous or violent than others (as popular entertainment also suggests) and tapped any xenophobic feelings that might be latent in the jury. Again the prosecutor was roaming outside this case, and she was beginning an appeal to prejudice. The tendentious effort reached a kind of climax in the prosecutor's reference to "a tightly knit organization of Colombians." The prosecutor had worked herself up to unproved assertions that there was such an organization and that it was made up of Colombians.[2] But there was no charge of conspiracy in the case or any proof of it. Implicit in the quoted remarks was also an assertion that the defendant was part of the criminal organization — a charge especially irresponsible, since the Commonwealth had pictured the defendant in a contrary role as "insert[ing] himself" into the situation and cutting in on and scooping a sale by Arengo, who was a target of investigation. Thus propositions were tendered to the jury as facts which were not shown to be so, and these were accompanied by insinuations that tried to take advantage of ethnic or national prejudice. See *Commonwealth v. Graziano*, 368 Mass. 325, 332 (1975); *Commonwealth* v.

---

[2] The prosecutor also spoke with abandon about "organizations like the one that was uncovered here in Chelsea."

*Mahdi*, 388 Mass. 679, 693 (1983). Compare *Commonwealth* v. *Velleco*, 272 Mass. 94, 99 (1930).[3]

Defendant's counsel objected in strong terms to the prosecutor's closing and said there was "absolutely reversible error" which could not be corrected. The judge, referring particularly to the remark about a "tightly knit organization," addressed the prosecutor and said, "What are you making these reckless statements for?" He added, "I'll try to expel that if I can . . . try to indicate in the most neutral way . . ." Counsel insisted that the damage done was not curable.[4] If it was curable, it

---

[3] A similar suggestion, that the defendant had knowledge of, and likely participation in, a criminal organization, appeared in the prosecutor's opening speech to the jury. The prosecutor asserted, and impliedly undertook to prove, that, after the defendant was arrested, he made a statement offering to assist the police. She said: "Mr. Gallego is arrested, advised of his Miranda rights, transported to the Boston Police Station where he makes a statement in which he offers to assist the police in apprehending the individuals whom they had been looking for all along." Surprisingly, the prosecutor introduced no evidence of any postarrest statement by the defendant; that the defendant made a statement so damaging to his defense stood on the prosecutor's word as a law enforcement officer. The prosecutor's assertion came at the end of her opening speech, and could remain in the memory of the jury.

In fairness, we note that the prosecutor could have found a basis for her statement in the testimony of Fencer, upon a pretrial motion to suppress, about the defendant's conduct after arrest. We note also that the defendant did not make any comment when the evidence failed to materialize, nor does he urge it as a point for reversal here. In *Commonwealth* v. *Fazio*, 375 Mass. 451 (1978), the court indicated that a prosecutor's assertion, not fulfilled by an offer of evidence, would not itself serve as a basis for reversing a conviction except in "a situation where the force of the prosecutor's opening remarks was overwhelmingly prejudicial and likely to leave an indelible imprint on the jurors' minds." *Id.* at 455. See also *Commonwealth* v. *Bearse*, 358 Mass. 481, 487 (1970). The fault here is not so grave, but it deserves to be weighed and cumulated with the faults in the prosecutor's closing speech. As the court said in *Commonwealth* v. *Kozec*, 399 Mass. 514, 523 (1987), "Once a properly raised objection to a prosecutor's argument is found to be vaild, the entire record, including the balance of the prosecutor's argument, becomes relevant in determining whether the error was prejudicial to the point of requiring a reversal of the conviction." See also *Commonwealth* v. *Burke*, 373 Mass. 569, 577 (1977).

[4] In argument to the judge, counsel suggested that the morning's headline put a further edge on the prosecutor's improper reference to the masses of drug cases on the Boston streets. The newspapers reported the funeral of an innocent twelve year old girl who had been caught in a battle of drug dealers.

probably was not cured: the judge's instructions were entirely bland, without even an effort to lay special stress on the boilerplate charge that closing statements were not evidence. See *Commonwealth* v. *Burke*, 373 Mass. at 576-577; *Commonwealth* v. *Shelley*, 374 Mass. 466, 470-471 (1978); *Commonwealth* v. *Person*, 400 Mass. 136, 143 (1987). Indeed one may doubt that explicit warnings from the judge could suffice where, in respect to the meat of the case, irrelevance and prejudice had been exploited in the closing speech. See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 31 (1982). Cf. *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681-682 (1974) (Hennessey, J., concurring)

The judgment of conviction is reversed, the verdict is set aside, and the case is to stand for retrial.

*So ordered.*