COMMONWEALTH *vs.* RICHARD L. MURCHISON.

No. 92-P-718.

Hampden. May 12, 1993. - September 7, 1993.

Present: SMITH, KAPLAN, & IRELAND, JJ

Further appellate review granted, 416 Mass. 1106 (1993).

*Practice, Criminal*, Argument by prosecutor, Argument by counsel, Trial by jury, Waiver of trial by jury, Instructions to jury. *Controlled Substances. Witness*, Impeachment, Bias.

The judge at a criminal trial properly commented to the jury with respect to defense counsel's improprieties in closing argument. [274-276]

In a criminal case where the judge proceeded to a bench trial on whether the defendant was a second offender under G. L. c. 94C, § 32, without the defendant having waived his right to a jury trial, the matter was remanded for appropriate trial. [276]

INDICTMENT found and returned in the Superior Court Department on September 14, 1990.

The case was tried before *Richard F. Connon*, J.

*Patricia A. O'Neill*, Committee for Public Counsel Services, for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Upon indictment and trial by jury, the defendant Richard Murchison was convicted of possessing heroin with intent to distribute (G. L. c. 94C, § 32) and was sentenced thereon as a second offender (G. L. c. 94C, § 32). He appeals. He does not contend that the evidence was insufficient to support the conviction. Rather he complains that a comment the judge felt obliged to make about parts of his counsel's closing speech to the jury, with its theme that the prosecution's police witnesses had lied in their testimony, was improperly critical and in effect deprived him of his right to final argument. We hold, to the contrary, that defendant's counsel (having been admonished early in the case when he opened to the jury) exceeded the limits of fair argument in

his closing and was rightly and quite moderately criticized by the judge. We affirm the conviction, but it is understood that the case must be remanded to remedy a defect in the handling of the issue of second offense.

1. After a conventional opening statement by the prosecutor, defendant's counsel, addressing the jury, said the case "involves a battle over credibility," but "[i]t's not really going to be a very fair battle." He went on to explain that Officer John O'Mara, witness for the prosecution, is "well spoken, well mannered, good looking, dresses nicely, makes a very good impression and he has testified in court in drug cases literally hundreds of times. He knows what to say. He knows how to say it." On the other hand, counsel said, the defense witnesses "won't share those qualities," but "those are the witnesses who will be presented so you can see what really happened that day."

Those remarks were overly tendentious. Counsel was expressing his personal opinion about the appearance and demeanor of a prosecution witness to be called. He was suggesting not only that experienced drug officers as a class are untrustworthy because they are prepared to say what is necessary for conviction, and know how to say it, but that the prosecution's intended witness O'Mara was one of that class. Further, counsel solicited sympathy by comparing what a prosecution can offer through its experienced and accomplished witnesses with what a defense could present through its scruffy counterparts.

When defense counsel concluded, the judge interposed and spoke sua sponte: counsel was out of bounds in saying that a Commonwealth witness speaks well and has testified in hundreds of cases; "[y]ou should listen to the facts as they are. You should make a determination of whether or not you will believe those facts based upon the weight that you give to the testimony of the witnesses. You are not to decide this case on the basis of any sympathy, that one side is more disadvantaged than another." The judge then spoke critically to counsel at sidebar. Counsel protested the judge's action "as limiting what I had to say to the jury in terms of evaluating the credibility of witnesses," but on the present appeal there is no claim of error in this episode.

2. At the trial proper, Officer O'Mara described himself as a member of a "surveillance unit" observing, on August 27,

1990, the "Fat Man's" parking lot in Springfield, a place where people came to drink and to buy and sell and use drugs. From a concealed vantage point about fifty feet from the edge of the lot, O'Mara saw the defendant receive some bills from a man in a white T-shirt and black shorts, then go to a nearby piece of curbing, take up a white plastic bag, remove from it a small white packet, and hand the packet to the other man. O'Mara identified the transaction as a sale of heroin. He radioed to the "take-down unit" a description of the buyer and the direction in which he was headed out of the parking lot (this man was not found) as well as a description of the defendant[1] and the general location of the cache. Officer Carlo Damato of the take-down unit, according to his testimony, went to the location O'Mara indicated and in several minutes, after a search thereabout, found a plastic bag containing six glassine packets of heroin underneath a piece of curbing. In the defendant's pants pocket was thirty dollars in cash.

Defendant's counsel, in sharp, extended cross-examination of the officers,[2] questioned what O'Mara could have seen at his distance from the defendant, and suggested that O'Mara's indication of the location of the relevant curbing was imprecise and Damato's search not well targeted, thereby putting in question whether the plastic bag that was retrieved could be associated with the defendant. The defendant testified that the man in the black shorts was a friend he had not seen for a while who hugged him as they met on the lot; that there was no exchange of money for heroin; that he had no connection with the plastic bag; and that the thirty dollars was an advance he had received that morning from his employer. (The employer testified to an advance.) The defendant said the police had searched everyone on the lot, then prowled the bushes and trees around the lot for thirty to forty-five minutes, and finally came up with the plastic bag. A man, James Wood, testifying that he was present at the lot during this time, confirmed this account.[3]

3. In his closing argument, defense counsel attacked the officers' credibility with professional skill. But he went on to

[1]The defendant was known to Officers O'Mara and Damato.

[2]Our narrative necessarily omits various details.

[3]The defendant and Wood were impeached by proof of prior convictions.

score some of their testimony as activated by dishonorable motives far removed from truthseeking. Urged on as well by counsel's sweeping characterizations of police officers as a group, the jury were in effect asked to find — following counsel's own hardly concealed opinion — that the officers had lied. We set out portions of the argument:

> "Police officers can make mistakes like anybody else. They can jump to conclusions just like anybody else does. In the end what matters is not what these police officers think, but what you, as jurors think.
>
> · . ·
>
> "It is important for you to understand what police officers think; what police officers think of Mr. Murchison is guilty. It's important for you to realize that because it is going to help you to understand the testimony as you think back over it.
>
> "These police officers are soldiers in a war on drugs. And like any other soldier when they see the person they think is the enemy, in this case they think Mr. Murchison is the enemy, they shoot and they shoot to kill. These police officers in this case wanted to get their conviction of Mr. Murchison. They want it because they think he is guilty. They want it because it is important to them to make any charges that they bring stick.
>
> · · ·
>
> "Now, as you've heard Officer O'Mara basically for the last six and a half years has done nothing but drug cases. He has testified in court hundreds of times. He knows what convinces juries. He knows what doesn't. He knows what he needs to say to get his conviction. And as I said, he wants his conviction in this case.
>
> · · ·
>
> "Isn't [Detective O'Mara] just making up the details to fit the story that he wants you to buy to fit to the story outline?
>
> · · ·
>
> "They just don't make up a case for no reason at all, because they think he is guilty; because they want to make the charges stick they put together the details.

They fill in little details to make the story one that will sell to a jury. And who better would know how to do that? An officer who was involved in drug arrests, thousands of drug arrests, testified in court hundreds of times, basically done nothing else for the last six and a half years. Well, maybe for police officers the end justifies the means, that if they think somebody is guilty they can get their conviction anyway."

When counsel finished, the judge stated at sidebar that he was going to address the jury. He spoke to the jury as follows:

"You're not to consider the fact that the officer would do anything to get a conviction. There is no evidence before you that they would do that, as well as that the end justifies the means. All witnesses take the stand, give testimony on equal footing. They are sworn to tell the truth, the whole truth, and nothing but the truth."

Counsel objected to this statement on the ground that it undercut his claim that the officers had lied, and his sole contention on the present appeal is that the statement constitutes reversible error. Here we should add that the judge continued, after his quoted words, to tell the jurors that the lawyers' opening and closing arguments were not evidence, and that their recollection of the facts, not the lawyers', was controlling. And after the prosecutor's closing,[4] the judge in his formal instructions described the factors going into an as-

---

[4]The prosecutor dealt with the differences in the facts as told by the Commonwealth and defense witnesses, and attacked defense counsel's strategy of depicting the officers as liars and their testimony as fabrications to convict the defendant. However, the prosecutor overspoke: "[t]o find [the defendant] not guilty you would have to believe that John O'Mara is a liar, that Carlo Damato is a liar." The Commonwealth in its brief regrets such a statement but on the whole does not suppose the jury would take it literally. The defense objected to the prosecutor's implication but on the present appeal does not contend that it was material error.

sessment of witnesses' credibility and several times stressed that the jury were not to favor one side over another.[5]

4. Appellate courts have been called on to scrutinize prosecutors' jury statements more often than defendants', but the standards of propriety are about the same for both sides. Compare S.J.C. Rule 3:08, PF 13, 14, 382 Mass. 802 (1981), with Rule 3:08, DF 14, 15, 382 Mass. 807-808 (1981). Of course, the defense is entitled to rake over Commonwealth witnesses with intense cross-examination and by that and other means to test whether they are credible, see *Commonwealth* v. *Andrews*, 403 Mass. 441, 457 (1988), and telling the truth, see *Commonwealth* v. *Paradiso*, 24 Mass. App. Ct. 142, 150 (1987). The office of the closing speech is to call attention to the record made and to invite the jury to draw rational inferences.

In the present instance, despite the lesson he might have taken from the judge's earlier intervention, defense counsel acted as if standards were relaxed when he was prepared to claim that witnesses were deliberately lying. He did not confine himself to the record and solicit jury reactions but at various points improperly offered his personal opinion about the worth of witnesses' testimony. We find no record foundation for counsel's claim that each officer took the stand with the intention of telling whatever he thought necessary to convict the defendant, that it was important for the officer "to make any charges that [he brought] stick," and that therefore he "just [made] up the details to fit the story that he want[ed the jury] to buy."

This fault of counsel combined with another: his attack on the police witnesses was put in sweeping terms lacking record support and calculated to inflame the hearers. Counsel's statements — for example, that "[t]hese police officers are soldiers in a war on drugs"; that "when they see the person they think is the enemy . . . they shoot and they shoot to kill"; that they "know[] what convinces juries" and "what

---

[5]It may be noted here that the judge had questioned potential jurors about whether they thought police officers were more believable than other witnesses and had excused a juror who answered affirmatively.

[they] need[] to say to get [their] conviction"; and that "for police officers the end justifies the means" — were excessive in their characterization of all drug officers as zealots who sacrifice the truth to put their targets indiscriminately behind bars. Such broadbrushing not only departed from *this* case, where counsel belonged, for a bout of general vilification but played on latent prejudices that the jurors might have had about police officers, while cozening sympathy for a defendant faced with masters of deceit. The cases are many that have spoken against what we have called "broadbrushing": *Commonwealth* v. *Graziano*, 368 Mass. 325, 331-332 (1975) (defendant and several witnesses, all of Italian heritage, characterized as members of organized crime); *Commonwealth* v. *Shelley*, 374 Mass. 466, 469-470 (1978) (defendant's expert witnesses as "terrible mercenary soldier" and "prostitute"); *Commonwealth* v. *O'Brien*, 377 Mass. 772, 777-778 (1979) (expert witness as "hired gun"); *Commonwealth* v. *Hogan*, 12 Mass. App. Ct. 646, 652-653 (1981) (defendant as "hit man" and defense witnesses as "paid off, threatened, or not to be believed" because "from the 'lower end' of South Boston"; also references to "underworld"); *Commonwealth* v. *Gallego*, 27 Mass. App. Ct. 714, 717-720 (1989) (Colombian drug dealers "more dangerous or violent than others"). Cf. *Commonwealth* v. *Munera*, 31 Mass. App. Ct. 380, 387-388 (1991).

The judge was right to speak when he did, see *Commonwealth* v. *Kozec*, 399 Mass. 514, 519 (1987), and the defense could count itself lucky (although it lost in the end) that the judge's remarks were so mild — indeed touching on only a couple of the toxic elements of the closing speech. Much remained in counsel's closing that the prosecution might have asked the judge specifically to rebuke or correct. On the whole case, we think a sensible jury, helped by the judge, would have washed out extraneous rhetoric and addressed themselves to the merits.

As noted above, there was a mistake in the treatment of the issue of second offense. The defendant had a right to jury trial upon it, see G. L. c. 278, § 11A, but could relinquish

that right by his written waiver, see G. L. c. 263, § 6; *Commonwealth* v. *Smith*, 403 Mass. 489, 493 (1988), voluntariness and understanding having been established by full oral colloquy. See *Commonwealth* v. *Schofield*, 391 Mass. 772, 775 (1984). Here the judge proceeded to a bench trial without the safeguards. The conviction is affirmed, but the case is remanded for appropriate trial of the second offense question.

*So ordered.*