COMMONWEALTH vs. JOHN L. MEADOWS
(and seven companion cases[1]).

Franklin. April 30, 1981. — November 25, 1981.

Present: HALE, C.J., ARMSTRONG, & SMITH, JJ.

*Practice, Criminal,* Directed verdict, Venue. *Joint Enterprise.*

At the trial of indictments for assault and battery by means of dangerous
weapons, a jury could properly conclude from the evidence that the
defendants, members of a motorcycle club, were engaged in a joint
enterprise with the purpose of avenging the beatings of a member of
the club and his companion by the three victims, that all the defend-
ants shared the mental state of those who shot and stabbed the victims,
and that they had reason to know that dangerous weapons would be
used. [640-645]
Motions for a change of venue in a criminal case, based on alleged injuri-
ous pretrial publicity, were properly denied. [645]

INDICTMENTS found and returned in the Superior Court
on September 23, 1977.

The cases were tried before *Greaney,* J.

*Howard S. Sasson & Murray Shulman* for the defendants.

*Stephen R. Kaplan,* Assistant District Attorney (*Eileen
O'Connor,* Assistant District Attorney, with him) for the
Commonwealth.

SMITH, J. As a result of a violent battle in Gill on August 6,
1977, the defendants Oscar Mineau and John J. Baltas were
convicted on indictments for assault and battery with a
dangerous weapon (gun) on Francis M. Golembeski, assault
and battery with a dangerous weapon (knife) on Richard
Melnick, and assault and battery with a dangerous weapon

---

[1] Of the companion cases, three are against Oscar Mineau, three are
against John J. Baltas, and one is against John L. Meadows.

(knife) on Thomas Yestramski. The defendant John L. Meadows was convicted on indictments for the same respective offenses upon Golembeski and Yestramski. The defendants allege error in that the judge improperly (1) denied their motions for directed verdicts (the trial concluded in 1978), and (2) denied their motions for a change of venue based on the ground of alleged injurious pretrial publicity. Finding no error, we affirm the judgments.

1. *Motions for directed verdicts.* The defendants rested after the Commonwealth presented its evidence. They then filed the subject motions. The evidence presented by the Commonwealth during the course of the nine-week trial was mostly circumstantial. We must sustain the denials of the motions if "there was enough evidence that could have satisfied a . . . [jury] of each [essential] element [of the offenses] beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). We consider the evidence in its light most favorable to the Commonwealth. *Commonwealth* v. *Fluker,* 377 Mass. 123, 128 (1979). Because the evidence is mostly circumstantial, the role of inferences is obviously heightened. The inferences drawn by the jury from the evidence need not be necessary or inescapable, as long as they are reasonable and possible, and not unwarranted because they are too remote. *Commonwealth* v. *Albano,* 373 Mass. 132, 134-135 (1977). *Commonwealth* v. Beckett, 373 Mass. 329, 341 (1977). However, no essential element of the crimes may rest "in surmise, conjecture, or guesswork." *Commonwealth* v. *Kelley,* 359 Mass. 77, 88 (1971). We summarize the facts that could have been found by the jury.

On August 6, 1977, two unrelated social events took place in Gill. A festival was in progress at the Renaissance Community Center (Center), and a company picnic was being held a short distance from the festival. Included among the approximately one thousand persons attending the festival were about eighteen members of the Diablos, a motorcycle club with branches in Massachusetts and Connecticut. All of the defendants and two other persons, Gonzales and

Samsel, were members of the Diablos.  On that day, the Diablos were distinctively garbed in the club uniform consisting of boots, jeans and cut-off dungaree jackets or vests known as "colors," which bore the Diablo symbol, a devil in a top hat, together with geographic and optional emblems. As the day wore on, it became necessary to replenish the dwindling liquor supplies both at the festival and at the picnic.  One Holly, a follower of the Diablos, and Gonzales drove to a package store in Holly's GTO convertible automobile.  At the same time the victims, Melnick, Yestramski and Golembeski left the picnic in a jeep driven by one Norman and proceeded to the same package store.  As a result of a trivial matter, Holly and Gonzales became embroiled in a fight with the out-party from the picnic.  During the struggle, both sides suffered wounds, but Holly and Gonzales received the worse end of the encounter.[2]  Upon departing from the skirmish, Gonzales yelled, "We will be back to get you."  Holly and Gonzales returned to the Center.  Upon seeing Holly and Gonzales, Meadows yelled, "All Diablos over here."[3]  He was joined by several men, including Gonzales, all with Diablo emblems.  The crowd milled around for two or three minutes, shouting, "Where did it happen?" "Where are they?" and, "Get those guys." Gonzales yelled that the other car was reddish or rust color. Someone yelled, "Let's go," and Gonzales jumped into the GTO, where he was joined by Meadows, Baltas and Samsel.  Others got into two automobiles, a Cadillac and a Pontiac.  The GTO, driven by Meadows, and followed by the Cadillac and the Pontiac left the Center, and proceeded in the direction of the scene of the fight.

[2] In the encounter, Gonzales' colors were torn, a fact that becomes important in considering the disposition of the motion relative to Mineau.

[3] Meadows was identified by a three-stage process.  Photographs taken at the Center on August 6, 1977, were placed in evidence as exhibits.  One witness designated a person, name unknown to him, in a photograph as the individual who called the meeting; another witness identified Meadows as the person designated by the first witness; and a third witness stated that the exhibit was a photograph of what she had witnessed on August 6, 1977.

Prior to the defendants' arrival at the scene, the victims had been joined by other persons who were attending the picnic. Norman had been injured and was taken to a hospital by the police. Yestramski and Melnick in one car and Golembeski in another vehicle followed the police. Accompanying Golembeski were four other persons, including one Braun. As the convoy containing the victims proceeded along the road, they met the three-car convoy containing the defendants. Yestramski saw the GTO and yelled, "That's them." Somebody in the GTO pointed to Yestramski's car and said the same thing. As the GTO passed the two cars, Yestramski made a U-turn and followed in the direction that the GTO had taken. The GTO skidded to a stop. Braun jumped out of the automobile that Golembeski was driving and headed in the direction of the GTO. The GTO backed up and then drove at Braun, who picked up a rock and broke the windshield of the car. The GTO stopped, and Samsel came out of the passenger side. He pulled a twelve-inch knife out of a sheath and said to Braun, "You want to throw rocks, you son-of-a bitching bastard? I'll cut your balls off." Samsel started to chase Braun, but then somebody called out, "No, not him, the blond haired kid." Yestramski was chased by Gonzales and Samsel, who had his knife in his hand. Yestramski fell and was beaten and kicked. One of the individuals said, "This is for my buddies," and stabbed Yestramski. Then one of them said, "That's it, let's get out of here." They ran up the road and got in the GTO. Melnick was chased by four persons, all with knives. He fell and was stabbed at least six times. Golembeski, while trying to leave the scene in his automobile, heard five shots and was wounded in the elbow by a person from the GTO or the Cadillac.

Between five to ten minutes after the GTO had left the Center it returned at high speed. It did not stop and was driven through the Center deep into the woods. Ten minutes later a police officer arrived. He noticed to his left about a dozen men wearing blue denim jackets with Diablo emblems standing around some motorcycles. To his right,

he saw three men, including Mineau,[4] walking from the direction where, forty minutes later, he found the GTO in the woods. The three men were not wearing denim jackets or the Diablo emblems. The police officer left the Center but returned shortly. At this time he noticed that the dozen men had discarded their denim jackets and Diablo emblems. He continued his search for the GTO and eventually found it hidden in the woods. In the trunk were colors belonging to Gonzales and Mineau. Three pairs of footprints were discovered leading from the GTO to the field where Mineau was first seen by the officer.

The defendants assert that because there was no evidence that they had shot or stabbed the victims, their cases should not have been submitted to the jury. They argue, in the cases of Meadows and Baltas, that the Commonwealth's proof amounted at best to proof that they were present at the scene of the fight. The Commonwealth, in turn, claims that the defendants were all engaged in a joint enterprise, avenging the beatings of Holly and Gonzales by assaulting and beating the victims by the use of dangerous weapons. Therefore, we examine the defendants' contentions in light of the theory that "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal," *Commonwealth* v. *Soares*, 377 Mass. 461, 470 (1979), and that the jury could infer the requisite mental state from the defendants' knowledge of the circumstances and subsequent participation in the offense. See *Commonwealth* v. *Ferguson*, 365 Mass. 1 (1974).

At the close of the Commonwealth's evidence, the jury properly could have found that, after the beatings of Holly and Gonzales were reported to Meadows, he convened a meeting of the Diablos. At the meeting, the Diablos were in an angry mood directed at the persons who had assaulted

[4] Mineau was identified through photographs as being present at the Center prior to the fracas. He was shown wearing colors that were identical to the colors later found in the trunk of the GTO.

Holly and Gonzales. There was evidence that after Gon-
zales described Norman's automobile, the Diablos jumped
into three separate cars and left in the direction of the
original fight. The jury could infer that the sorting out of
Golembeski, Yestramski and Melnick from their friends at
the scene of the battle ("No, not him, the blond haired kid")
indicated that the defendants and the other Diablos were
engaged in a joint venture aimed at revenge. The jury
could infer that the defendants shared the mental state of
the principal actors, those who shot or stabbed the victims.
*Commonwealth* v. *Richards*, 363 Mass. 299, 307-308
(1973). See *Commonwealth* v. *Jones*, 6 Mass. App. Ct. 750,
759 (1978), where the *Richards* standard was held to be ap-
plicable to the crime of assault and battery by means of a
dangerous weapon. Assault and battery by means of a
dangerous weapon is a crime requiring general intent.
*Commonwealth* v. *Randall*, 4 Gray 36, 38-39 (1855). *Com-
monwealth* v. *Jones, supra.* The jury could find that every
person involved in the joint venture had reason to know that
dangerous weapons were to be used. Samsel, with his
twelve-inch knife, rode in the same car as Meadows and
Baltas. (See *Commonwealth* v. *Ferguson, supra,* as the
drawing of inferences of a defendant's knowledge that a
knife is present, based on the size of the knife.) Melnick saw
four persons chasing him with knives. Five shots were fired
from either the GTO or the Cadillac. The jury could infer
that all the passengers in the three-car convoy took an active
part in the fight. Indeed, it would strain credulity to con-
clude that the jury could only have found that the defend-
ants were "serenely present . . . while the chaotic events of
the [battle] swirled around them." *Commonwealth* v.
*Sampson*, 7 Mass. App. 514, 518 (1979).

In regard to Mineau, unlike Meadows and Baltas, there
was no direct evidence that placed him in one of the three
cars that left the Center and proceeded to the scene of the
conflict. However, the jury could infer that Mineau was
with Gonzales at the fight. The GTO, after the fight, came
back to the Center, did not stop, and was hidden in the

woods. Mineau's colors which he had been wearing prior to the fracas were found with the colors of Gonzales in the trunk. The testimony in regard to the footprints and the observation by the police officer of Mineau in the field ten minutes after the car had sped through the Center placed him in the GTO at least during and after the fight. It also placed Mineau with Gonzales, who was an active participant. Because the jury could find that every Diablo who was at the fight was an active participant in the crimes that occurred at the scene of the fight, Mineau's case was properly submitted to the jury.

2. *Change of venue because of alleged injurious pretrial publicity.* The defendants claimed error in the denials of their motions for change of venue based on the ground of injurious pretrial publicity. The judge held a hearing on the motion and filed a detailed, comprehensive memorandum. The motions were properly denied for the reasons contained in that memorandum.

*Judgments affirmed.*