COMMONWEALTH *vs.* ERROLL WOLCOTT.

No. 89-P-369.

Suffolk. October 16, 1989. - January 11, 1990.

Present: PERRETTA, KAPLAN, & SMITH, JJ.

*Evidence*, Motive, Intent, Opinion, Expert opinion, Relevancy and materiality, Competency. *Witness*, Expert. *Identification*.

The judge at a criminal trial erred in admitting opinion testimony given by a police officer with respect to gang activity where, even if the witness had been qualified as an expert, in the circumstances the evidence was plainly unreliable, irrelevant and prejudicial. [207-210]

INDICTMENTS found and returned in the Superior Court Department on June 10, 1987.

The cases were tried before *Mel L. Greenberg*, J.

*Emanuel Howard* for the defendant.

*Julie W. Heflin*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant Erroll Wolcott was convicted on indictments for armed assault with intent to murder Karen, Floyd, and Marlon Straw, for assault by means of a dangerous weapon upon Karen and Floyd, and for assault and battery by means of a dangerous weapon upon Marlon Straw and Michael Thomas.[1] In the course of trial, the judge, over continuing objection, allowed in evidence testimony by a police officer about the organization and tactics of Jamaican gangs. This was received in proof of the motive for the armed assaults with intent to murder, and also as bearing on the intent element of these crimes. It will appear that there was grave error in the admission of this testimony. Because of the

---

[1]The jury acquitted the defendant on an indictment for armed assault with intent to murder Michael Thomas. For the significance of this acquittal, see our point 4 *infra*.

error, the convictions for the relevant crimes must be reversed. However, the other convictions may stand.

We shall recount the two criminal episodes from which the charges derived, summarize the questioned testimony, and discuss the error of law and its consequences.

1. *Criminal episodes.* (a) *Incident of March 4, 1987.* Karen Straw testified about this episode. Then aged eighteen, Karen was visiting that evening at her grandmother's house at 949 Blue Hill Avenue, Dorchester. Her brother, Floyd Straw, aged twenty, came by in their mother's Nissan Sentra automobile to pick her up and take her home to 68 Callender Street, Dorchester. Floyd was in the driver's and Karen in the passenger's seat. As they pulled out along Blue Hill Avenue at Paxton Street, a blue Audi automobile, which had been parked on Paxton, followed. Becoming conscious that the Audi might be in pursuit, Floyd took a circuitous path to test the Audi's intention: he drove to the first lights on Blue Hill Avenue, left onto Stratton Street, down Stratton, right onto Lucerne Street, left down Floyd Street, right onto Lyford Street, then left on Woodrow Avenue to its intersection with Milton Avenue, a rather desolate place just beyond a train overpass. The Audi had followed, and now pulled a few feet ahead of the Sentra, forcing it to an abrupt stop. As Floyd switched on his high beams, two men emerged from either side of the Audi and, turning to face the Sentra, began shooting at it. A bullet broke through the windshield and shattered the back window. Before she ducked down in the car to escape the gunfire, Karen said she recognized the men as "Jamike" (Michael Nelson) and "Beany." Karen remained crouched as Floyd drove home to Callender Street. Karen and Floyd were uninjured.

Karen testified that she had seen Jamike lots of times at her mother's house and at a store, presumably the "Norfolk Smoke Shop" operated by her brother Wayne; Jamike was a friend of Wayne and another brother, Danny. Beany she had first observed sometime in 1986 or early in 1987 when they were on a bus from New York. Later she had seen him two or three times at her grandmother's house, in the company of

Jamike. Evidently she had never had a conversation with Beany. She could not testify about Beany's height, except to say that Jamike was taller than Beany. No questions were put to her about his other characteristics.[2]

Officer Lawrence Celester on March 5 showed Karen a large number of pictures from which Karen selected Jamike's. The arrays did not include a picture of Beany, and Karen made no such identification. Celester testified that Karen told him Beany was about twenty-two years old, five feet, eight inches tall, and weighed 140 pounds.[3]

At trial Karen identified the defendant Wolcott as the man Beany.

There is no mention in the record of any police interview with Floyd, and he did not appear as a witness.

(b) *Incident of March 23, 1987.* Marlon Straw, aged fifteen, younger brother of Karen and son of Yvonne Lywood (see note 2 *supra*), gave the main testimony about this incident. About 5:00 P.M. that day Michael Thomas, who managed Wayne Straw's Norfolk Smoke Shop, met Marlon at the grandmother's place on Blue Hill Avenue and the two proceeded in Thomas's red Hyundai automobile to a store at 438 Dudley Street, Roxbury, to buy supplies for Wayne's shop. They parked on the "wholesale" side of the store facing Langdon Street, went in and bought about $200 worth of cigarettes and candies, and received the purchases in two cartons which they carried out and stored in the hatchback of the Hyundai. As they entered the car — Thomas taking the driver's seat and Marlon the passenger's — Marlon heard gunshots, and turning to his right, saw a man he said he knew as Beany closing in on that side of the car, perhaps

---

[2]Yvonne Lywood, Karen's mother, was on hand when Floyd and Karen arrived at Callender Street. Karen told her, she said, that Jamike and Beany had shot up the car. Lywood said Jamike had been at her house quite a few times to play a "disco set" with her son Wayne. She had never met Beany.

[3]The defendant's arrest booking sheet of March 29, 1987, shows a date of birth making him twenty-one or twenty-two; and five feet, three inches, 140 pounds.

ten feet from it.[4] The man came to within arm's length, still shooting. Bullets struck the passenger's window and left holes in that side of the car. Marlon was hit in the right hand and left arm and took a serious wound in the abdomen. Thomas, himself wounded in the right arm, helped or dragged Marlon out of the car on the driver's side and the two commenced running toward a fence beside the store parking lot on Langdon Street. Marlon thought the assailant ran toward New Dudley Street. He said he could see a green Honda automobile on that street with a female behind the wheel who looked like "Denise."[5] Marlon and Thomas returned to the store and were taken by ambulance to Boston City Hospital. Marlon remained there under treatment for two weeks.

Marlon testified that he had seen Beany on several occasions. He had not socialized with Beany; just said "hello" and "goodbye." He recalled once having a quick view of Beany riding by in a car on Codman Square (near Wayne's store on Norfolk Street and Talbot Avenue).

Marlon said that when interviewed by Officer Celester he just gave the name Beany as his assailant but without mention of the man's height or other details. He told Celester he knew Jamike.

Marlon indicated at trial that the defendant was the man he knew as Beany.

Celester, in his testimony, said Marlon had stated, when interviewed at the hospital, that he saw Jamike as well as Beany at the scene of the shooting, and that "Lissy" was driving the Honda. Detective Sergeant Thomas Gaughan testified that Marlon told him at the hospital that Jamike was standing right behind Beany when Beany was firing. Gaughan was certain Marlon had given the names of Beany and Jamike and said that both men had fled the area.[6]

---

[4]Marlon said the assailant wore eyeglasses. The defendant's booking sheet shows that he then possessed eyeglasses.

[5]We surmise that to be visible to Marlon the car would have to be nearer than New Dudley.

A green Honda was registered in the defendant's name.

[6]Lywood testified that Marlon told her Beany shot him — apparently without mentioning Jamike.

Thomas was also interviewed by the police at the hospital, but we do not know what he said. He did not appear as a witness.

2. *Testimony of Detective Ingersoll.* Anticipating that the Commonwealth might offer testimony about gangs in proof of the indictments for armed assault with intent to murder, the defense moved in limine, without success, to exclude the evidence in that connection. Before allowing the testimony of Detective William J. Ingersoll on the subject to be presented at the trial proper, the judge heard it upon voir dire, conducted to assist him in determining whether a jury could find that Jamaican gangs existed and that the defendant had a relation to a gang that might be relevant to the case. The judge decided to admit the testimony; recognizing the potential prejudicial effect of such material, he offered to give "special curative instructions."[7] As noted, the testimony was received on motive and intent. There was continuing objection by the defense on grounds of unreliability, irrelevancy, and undue prejudice.[8] As Ingersoll's testimony before the jury entered into the relevant verdicts, we describe that version rather than his similar testimony received provisionally at voir dire.

Detective Ingersoll, a Boston police officer with long experience in Area B (Roxbury, Dorchester, Mattapan, and North Dorchester), served as intelligence officer there and worked in the photo identification unit. He came to the intelligence assignment after an eighty-hour course of instruction. Around 1984, Ingersoll began a concern with Jamaican gangs, or "posses," and latterly he became a member of, or a worker with, Federal and local task forces on the subject. (Ingersoll is a deputy Federal marshal.) In July, 1987, he attended in Miami a nationwide conference centering on organized crime by Jamaicans. Information circulates among

---

[7]See note 17 *infra.*

[8]Defense counsel commented to the effect that no reliable information had been provided about the supposed involvement of the defendant with a gang and that the Commonwealth was impugning the defendant's character by reference to extraneous persons not on trial or presented as witnesses.

the police groups, and as intelligence officer Ingersoll collates information of varying quality from a variety of sources.

According to Ingersoll, Jamaican posses derive from political groups that operated in Jamaica. In earlier years the posses that worked here remitted money to Jamaica, but the ties have weakened, and the posses, involved in drug trafficking and other criminal activities, now generally do not forward their gains abroad.

The posses preserve some of the features or habits of gunmen of the American West as depicted in movies. (Indeed, thence comes the word "posse.") Posse members are quick to retaliate for assumed injuries. To reach a targeted individual, an avenging gunman, according to Ingersoll, will shoot in random fashion, will not hesitate to use a fusillade of bullets even if this involves injury to innocent bystanders. The posses are loose knit and often break up with quarrels and lethal fighting among factions.

In Ingersoll's opinion, in March, 1987, there were eleven posses active in Boston. Besides information coming in from the general sources already mentioned, Ingersoll gathered statements about these posses from victims of gang violence and from confidential informants and "infiltrators." Thus he was able to say about the "Dog" posse, one of the eleven, that its original leader was one Roy Douglas ("Lenki Roi"), and that he was followed by a brother, Edgarton August Douglas ("Doc"). The Dog posse had fractionated with internecine strife. Ingersoll stated in direct examination that Jamike and Beany were members of the posse, Karen and Marlon Straw were not; and in cross-examination, that "sometime ago" Wayne Straw was a member with the street name "Slick."

According to Ingersoll, that a person has a street name (which remains constant even if the person uses other names for other purposes) indicates that he is a posse member. Thus, as to Jamike: Q: (on cross-examination) "And is it because of this street name 'Jamike' that you believe that he's a member of the Dog Posse?" A: "Yes, sir." Q: "Is there any

other reason?" THE COURT: "Just yes or no." THE WIT-
NESS: "No."

As to Beany, we have the following from Ingersoll. Q: (on
cross-examination): "Is it fair to say that based upon the in-
formation that you have, you're not certain that Erroll Wol-
cott is a member of the Dog Posse; isn't that correct?" A: "I
believe him to be." Q: Well, you believe, but you're not cer-
tain, are you?" [PROSECUTOR]: "Objection, your Honor."
THE COURT: "Well, I'll let him answer the question to the
degree of his certainty one way or the other." THE WIT-
NESS: "I believe him to be due to his association." Q: I
asked you if you are certain that he is a member of the Dog
Posse?" A: "I am." Q: "You are certain?" A: "Yes." Q:
"And that's based upon the fact that he uses the name
Beany, is that right?" A: "Among other things, yes, sir." Q:
"Well, wasn't your testimony earlier, Officer, that you relied
solely upon the use of the nickname Beany?" [PROSECU-
TOR]: "Objection, your Honor." THE COURT: "Sus-
tained." Q: "Well, another fact that you are relying upon to
reach your conclusion that he's a member of the Dog Posse is
his relationship with a fellow by the name of Jamike, isn't
that correct?" A: "Correct." Q: "And you formed that basis
based upon statements attributed to Karen Straw and to her
brother Marlon Straw, is that correct?" A: "Essentially cor-
rect, yes, sir." Q: "And that is based upon your — at least
statements attributed to them that Erroll Wolcott was with
Jamike on at least two occasions, is that correct?" A: "That
is correct." Q: "And does that suffice, Officer, to state the
extent of Erroll Wolcott's relationship with Jamike?" A:
"Yes, sir."

Ingersoll conceded that he had not undertaken any surveil-
lance to prove a connection of the defendant with the Dog
posse, nor did he know of anyone else who had done such a
surveillance. There were no tape recordings of the defend-
ant's conversations that might show a connection. Ingersoll
had not received information from any of his police corre-
spondents that the defendant had such a connection.

3. *Errors in the allowance of Ingersoll's testimony.* Detective Ingersoll was not offered as an expert witness and was not qualified as such by the judge. If it be thought that the judge may have so qualified the witness sub silentio,[9] it remains the fact that the witness was not presented to the jury as an expert, and the judge's instructions to the jury were barren of any reference to experts or expert testimony or to the considerations that apply in evaluating such testimony. It follows that Ingersoll's testimony must be viewed as lay testimony and its reception in evidence judged in that light. It was plainly inadmissible, as it consisted of a melange of hearsay and opinions based on hearsay, all well beyond the permissible range of testimony by nonexperts.[10] Concerning the basic requirement that lay witnesses confine their testimony to what they have themselves gleaned by the use of their senses, see *Commonwealth* v. *Tracy,* 349 Mass. 87, 95-96, (1965), cert. denied, 384 U.S. 1022 (1966); *Commonwealth* v. *Robertson,* 357 Mass. 559, 563 (1970); *Commonwealth* v. *Smith,* 17 Mass. App. Ct. 918, 920-921 (1983); Liacos, Massachusetts Evidence 96 (1981).

By the disregard of the role in which Ingersoll appeared as a witness, the Commonwealth was improperly relieved of satisfying the tests for establishing that Ingersoll was an expert or his methods reliable, cf. *Commonwealth* v. *Vitello,* 376 Mass. 426, 440-442 (1978); *Commonwealth* v. *Cifizzari,* 397 Mass. 560, 569-572 (1986), and the judge escaped the task of deciding within the bounds of reasonable discretion whether Ingersoll in fact had adequate knowledge and expe-

---

[9]Contrast *Commonwealth* v. *Boyd,* 367 Mass. 169, 181-183 (1975), where the judge was found to have ruled implicitly that a psychiatrist was qualified to testify as an expert about the defendant's sanity. There, however, the subject was commonly understood to be one for expert testimony by psychiatrists, and the judge instructed the jury expressly that this was an expert witness.

[10]Objection on this ground may be taken as comprehended in the defendant's objection to the unreliability of the testimony. Were it not so, we would be prepared to say that the error involved was such that it should be recognized to avoid "a substantial risk of a miscarriage of justice" under the rule of *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967).

rience to be named an expert. For the judge's duty, see *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975); *Commonwealth* v. *Francis*, 390 Mass. 89, 98-99 (1983); *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987). There are instances in other jurisdictions where in particular situations members of the police have been held qualified as experts on the subject of the characteristics or activities of organized gangs. See *People* v. *McDaniels*, 107 Cal. App. 3d 898, 902-905 (1980); *People* v. *Calderon*, 98 Ill. App. 3d 657, 661 (1981); *People* v. *Jackson*, 145 Ill. App. 3d 626, 633-635 (1986). See also *United States* v. *Angiulo*, 847 F.2d 956, 973-975 (1st Cir.), cert. denied sub nom. *Cincotti* v. *United States*, 488 U.S. 852 (1988). And instances where they have fallen short of qualification. See *In re Wing Y.*, 67 Cal. App. 3d 69, 75-79 (1977); *People* v. *Washington*, 127 Ill. App. 3d 365, 386-387 (1984). We do not know how Ingersoll would deserve to fare if the matter was exposed to full inquiry and attack and the judge was required to rule.

Suppose Ingersoll had been qualified as an expert, and the testimony he in fact offered went no further than that recorded at the trial below: it should have been excluded on all the grounds urged by the defense. When it passed beyond generalities and attempted to reach the present prosecution, it was very weak and at the same time confusingly tendentious. The opinion that Beany (identified as the man in the dock) was a member of the Dog posse was supported by little more than his use of a street name and his association with Jamike, whose membership in turn seemed to rest on his use of a street name. The opinion did not rank above unacceptable conjecture. Contrast *Commonwealth* v. *Pikul*, 400 Mass. 550, 554-555 (1987); *Commonwealth* v. *Gregory*, 17 Mass. App. Ct. 651, 655-656 (1984). The quoted passage with Ingersoll under cross-examination about Beany's membership is, indeed, a memorable example of the vagaries, circularity, and dangers of trying to prove some kind of guilt by association.[11]

---

[11]Compare Justice Harlan's measured remark about personal guilt and the vice of inferring that guilt from a person's association even with an

By his testimony, Ingersoll was insinuating, without actually saying so — and the prosecutor followed suit in her closing speech — that the criminal adventures were motivated and their intent fixed by gang relationships. Actual proof, however, was notably lacking. Ingersoll made no claim that Karen, Floyd, or Marlon was a member of the Dog posse or any posse. He had an opinion, presumably again based on street name or association with Jamike, that Wayne at one time, unspecified, was a member of the Dog posse. (Strange to say, the opinion about Wayne was elicited from Ingersoll during his cross-examination over objection by the Commonwealth!) Ingersoll offered nothing to suggest what it was about Wayne that might call for any attack or reprisal. Moreover, attack on whom? Ingersoll indicated that an attack upon a given target might take in bystanders, but here the dimly posse-related Wayne was not present as a target at either incident. Proof there was none that the defendant was, e.g., acting at the direction of gang leaders or in furtherance of their goals;[12] attacking the victims in retaliation for some earlier event;[13] acting to eliminate competition by gang rivals;[14] trying to punish trespassing on gang territory.[15]

---

acknowledged criminal: "[W]hen the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity . . . that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause of the Fifth Amendment." *Scales* v. *United States*, 367 U.S. 203, 224-225 (1961). Recently there has been much concern in the Commonwealth about resting a person's civil liability or disability upon his or her mere association with others. See *Spence* v. *Reeder*, 382 Mass. 398 (1981); *Spence* v. *Gormley*, 387 Mass. 258 (1982) (eviction of tenants from housing projects).

[12]Cf. *People* v. *Dominguez*, 121 Cal. App. 3d 481, 497-499 (1981); *People* v. *Hairston*, 46 Ill. 2d 348, 372 (1970), cert. denied, 402 U.S. 972 (1971).

[13]Cf. *People* v. *McClendon*, 146 Ill. App. 3d 1004, 1007-1009 (1986); *State* v. *Garcia*, 99 N.M. 771, 774-775, cert. denied, 462 U.S. 1112 (1983); *People* v. *Connally*, 105 A.D. 2d 797, 797 (N.Y. 1984).

[14]Cf. *Commonwealth* v. *Pickles*, 364 Mass. 395, 399-400 (1973); *Dominguez*, 121 Cal. App. 3d at 490-491; *Commonwealth* v. *Gwaltney*, 497 Pa. 505, 513-514 (1982).

[15]Cf. *People* v. *Frausto*, 135 Cal. App. 3d 129, 139-140 (1982).

Thus, to sum up, were Ingersoll testifying even as an expert, he offered nothing that was measurably indicative of purpose or design to support the charges of armed assault with intent to murder.[16]

4. *Conclusion.* The mistaken admission of Ingersoll's testimony corrupted the trial of the charges just named, and the relevant convictions must be reversed. It will be open to the Commonwealth to retry those indictments if it should be so advised (subject as usual to consideration of any possible double jeopardy issues).

The Ingersoll testimony had a toxic element; it made an unspoken appeal to fears of gang violence and to latent ethnic prejudice and xenophobia. Compare *Commonwealth v. Graziano*, 368 Mass. 325, 331-332 (1975); *Commonwealth v. Gallego*, 27 Mass. App. Ct. 714, 718 (1989).[17] A doubt

---

[16]Of course, we should not be understood as suggesting that a person's properly proved relationship to a gang is necessarily irrelevant and inadmissible as some evidence of commission of crime. For situations where the relationship became relevant and thus admissible, see, e.g., *Commonwealth v. Pickles*, 364 Mass. 395, 397-400 (1973) (victim's affiliation with Campbell gang was relevant to motive where evidence showed that the gang had threatened defendant's illegal drug business); *Commonwealth v. Drew*, 397 Mass. 65, 78-80 (1986) (defendant's involvement in Satanism admitted where victim of ritualistic killing was intending to leave the Satanic cult and had already reported an earlier human sacrifice to the police); *Commonwealth v. Meadows*, 12 Mass. App. Ct. 639, 640-644 (1981) (defendant's membership in motorcycle club admitted in joint enterprise prosecution where club was avenging earlier attack on a member). And see cases cited, notes 12-15 *supra*. Observe, that in these situations it requires more than mere membership in a gang to convict of the criminal charge. "Membership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion." *In re Wing Y.*, 67 Cal. App. 3d at 79.

[17]In his instructions, the judge properly said that the defendant was not on trial for being a posse member, but he did not warn specifically about prejudice springing from suggestions of such affiliation that might unfairly bias the jury. See *Commonwealth v. Cancel*, 394 Mass. 567, 572-573 (1985).

arises whether the poison might not have infected the rest of the prosecution.

Our doubt could be readily dismissed if the identification of the defendant as the gunman was shown with overwhelming convincingness. That cannot be fairly said: while the two principal witnesses — Karen and Marlon — said they knew the defendant under the name of Beany before the criminal events, and there are corroborative details, such descriptions as they gave shortly after the assaults were sketchy, and Marlon put Jamike in, and then out, of the scene on Langdon Street. Precautionary tests, such as lineup or photographic selection were not made (except as Karen correctly identified Jamike's picture in the array and did not mistake any picture as being that of Beany). But if the identification evidence was not airtight, it was, we think, sufficient to entitle the jury to find that the defendant was the actor beyond a reasonable doubt — a matter preeminently for the jury. See *Commonwealth* v. *Dyer*, 389 Mass. 677, 684-685 (1983); *Commonwealth* v. *McGahee*, 393 Mass. 743, 749-750 (1985).

Thus there was a satisfactory basis for the convictions of assault by means of a dangerous weapon and assault and battery by means of a dangerous weapon. That the jury were not stampeded into those convictions is reasonably assured, first, by the fact that the judge in his instructions told the jury, in effect, to confine the Ingersoll testimony to their consideration of the armed assault with intent to murder charges; and second, by the fact that the jury discriminated in the case of the victim Michael Thomas by acquitting the defendant of the armed assault with intent to murder charge and convicting him of the charge of assault and battery by means of a dangerous weapon.

The judgments of conviction of armed assault with intent to murder are reversed and the verdicts are set aside; the judgments of conviction of the other charges are affirmed.[18]

*So ordered.*[19]

---

[18]The defendant claimed error in the judge's denying a motion to sever the indictments covering the March 4 incident from those covering the March 23 incident, and ordering all indictments to be tried together. The decision was not unreasonable. See *Commonwealth* v. *Cappellano*, 392 Mass. 676, 677-678 (1984); *Commonwealth* v. *Williams*, 18 Mass. App. Ct. 945, 946-947 (1984). Error was also claimed in the judge's admission, as some proof of consciousness of guilt, of evidence that the defendant was born Errol Williams but used the name Erroll Wolcott. This evidence was only marginally admissible on that basis and, if the case is retried, should preferably not be offered. Cf. *Commonwealth* v. *Fancy*, 349 Mass. 196, 201 (1965).

[19]Without going into detail, we can say that the effect of the reversals on the sentences imposed by the judge will be to reduce the maximum imprisonment from twenty-five years to fifteen years (subject, of course, to what may occur on possible partial retrial).