## COMMONWEALTH vs. TYRONE WILSON.

No. 97-P-222.

Suffolk. November 17, 1998. - February 5, 1999.

Present: LAURENCE, KAPLAN, & DREBEN, JJ.

*Identification. Evidence,* Identification, Statement of codefendant. *Practice, Criminal,* Argument by prosecutor.

At the trial of indictments, the judge did not err in denying the defendant's motions for a voir dire on the identification procedure used by police; moreover, the defense fully and vigorously tested the identification evidence at trial before a jury. [295-296]

At the joint trial of codefendants, there was no error in the judge's ruling admissible an admission of one defendant and denying a motion to sever the trials, where the statement in question did not incriminate the other defendant and where the judge gave firm limiting instructions to the jury. [296-298]

At the trial of indictments the prosecutor improperly exhorted the jury to "send a message," but the judge's immediate forceful instruction to the jury cured any prejudice; further argument of the prosecutor, insinuating but not specifically mentioning gangs or gang-related activity, which had been prohibited by the judge, was based on the evidence and was not unfair comment. [298-299]

INDICTMENTS found and returned in the Superior Court Department on July 15, 1993.

Pretrial motions for a hearing concerning identification procedures and for relief from prejudicial joinder were heard by *Barbara J. Rouse*, J., and *Maria I. Lopez*, J., and the cases were tried before *Lopez*, J.

*Daniel K. Sherwood* for the defendant.

*Karen A. Palumbo*, Assistant District Attorney (*Marcia Jackson*, Special Assistant District Attorney, with her) for the Commonwealth.

KAPLAN, J. Harry Bennett and Tyrone Wilson were jointly tried by jury and severally convicted of assault by means of a dangerous weapon (a shod foot) (G. L. c. 265, § 15B[b]) and

assault and battery (§ 13A), but acquitted of assault and battery by means of a dangerous weapon (a knife) (§ 15A[*b*]), and armed assault with intent to murder (§ 18[*b*]). The appeal of the defendant Tyrone Wilson is before us.[1] After describing the case, we have to deal with the appellant's claims related to his access to the Commonwealth's identification procedure, the use of an extrajudicial statement by Bennett, and the prosecutor's closing statement to the jury.

*The record.* The jury heard the following from the witnesses named in the margin.[2] On June 26, 1993, Jamie Burns, age nineteen (who became the victim) was visiting his cousin Ferlesia Nettles on Speedwell Street in the Dorchester section of Boston. Although Burns lived in the Roxbury section, he spent much time that year with Nettles and became friendly with the neighbors. Burns knew Harry Bennett (by his nickname Junior) well enough for conversation when they met on the street. Tyrone Wilson he recognized from hanging around the street, but did not know his name.

About 10:30 P.M., after playing cards and drinking beer for a few hours with a couple of friends, Burns and the others went to pick up food from a Chinese restaurant on Bowdoin Street. While outside on Norton Street waiting for the food, Burns encountered one Juanito, a Dorchester acquaintance. As the two talked and fooled around, Juanito dropped a knife sheath. Burns picked it up and returned it to Juanito. This was in the sight of six or seven men on the porch of a nearby house. Now Bennett walked by the house, and speaking loudly enough for the watchers to hear, he warned Burns not to hand anything to Juanito because he was fighting with Juanito, and "You better roll out before you get cracked in your cranium." Burns ran toward the restaurant. Seven or eight minutes later, Bennett, followed by the group from the porch, came up to Burns and tried by provocative words to start a fight with him. Burns turned away toward the restaurant. Without warning, Bennett punched him in the mouth.

[1]On the assault and battery, Wilson was sentenced to two and one-half years in a house of correction, thirteen months deemed served, the remainder suspended, with probation for eighteen months; on the assault with dangerous weapon, three to four years from and after, also suspended for eighteen months.

[2]Jamie Burns, Paul Jackson, Ferlesia Nettles, Detective George Foley, Detective Lawrence Pacino.

Burns escaped into a bar next to the restaurant and in the bathroom cleaned the blood from his face. He rested in the bar for a minute, then walked to the door. It opened and Bennett and Wilson stood there with others behind them. Bennett had a knife in his hand and said, "You come out the bar, I'm going to stab you up." Burns asked some people he knew in the bar to escort him; they led him out, forming a line around him, and together they walked past Bennett's group. A few minutes later the rescuers left, and Burns went on alone down Bowdoin to Toplift Street intending to go to the cousin's place on Speedwell Street. As Burns got to the corner of Bowdoin and Toplift, he looked back and saw the rescuers returning to the bar and Bennett and his group starting down Bowdoin toward him. The group reached Burns, and Wilson among them asked him why he wouldn't fight Bennett one on one. Burns said if he fought Bennett and won, he would have to fight the rest. He ran across the street to get away; the group followed. In the chase, Burns tripped and fell against a fence. Bennett and Wilson were the first to catch up. They began to punch and kick and stab Burns, Wilson working the upper body, Bennett the lower. In ten or fifteen seconds, the others arrived and joined in the kicking and punching. Very soon, all assailants scattered.

This was the meat of Burns's testimony.[3] Paul Jackson testified to seeing at a distance what happened from the confrontation on Bowdoin to the beating. He could not see the faces; the men wore hooded sweatshirts. Jackson accompanied Burns to Nettles's house. Police and an ambulance arrived. A paramedic at Boston City Hospital reported that Burns was treated for stab wounds to his chest, hand, and left elbow.[4]

Ferlesia Nettles took the stand to say Burns left her house to get Chinese food and came back later stabbed and bleeding. Burns told her he was stabbed by her friends, the "boys up the street." The following day she was hanging out on Bowdoin, near the restaurant, talking to friends, including Freddie Ross. Bennett joined them and said to Ross, "We stabbed that nigger up last night . . . on Topliff [*sic*] Street." Bennett was flicking a knife while speaking. On cross, she said Wilson was not

---

[3]Cross-examination dwelt, among other details, on the fact that Burns did not give a description of Bennett or Wilson to the police; see *infra* under "Identification procedure."

[4]In cross-examination, the paramedic denied Burns appeared drunk. Jackson said he thought he smelled alcohol on Burns's breath.

present or named when Bennett spoke. Nettles knew Bennett as "Junior" and Wilson as "Tyrone."

Nettles gave the foregoing account to Detective George Foley, who worked this section of Dorchester, after asking Foley how she could inform the police without getting herself involved. He said he would pass the word to those investigating the case.

The rest of the evidence for the prosecution dealt with the process of firming up identifications. Patrolling Bowdoin Street, said Foley, he saw Ross talking to a man Foley did not know. Foley told the man he was curious about his name because he saw him often with Ross and liked to know the people in the neighborhood. The man gave his name as Tyrone Wilson. Later Foley learned Bennett's full name. He secured pictures of both men and gave these to Detective Lawrence Pacino, assigned to the case. Two weeks after the episode, Pacino said he showed Burns two photo arrays; each was of nine pictures, one containing a picture of Bennett, the other Wilson. Burns identified the two as the attackers in the lead. Pacino had spoken to Burns the night of the attack but got only a statement about ten to fifteen black males without names or particular descriptions. He had not spoken to Burns again until the display of pictures. Indeed, cross-examination indicated Pacino had done a minimum of investigating.[5]

*Identification procedure.* The prosecutor responded to defense requests — notes and memoranda from the investigating officers, copies of the photo arrays, and names of potential witnesses to the attack. Still the defense thought the identifications were open to suspicion as Burns had not described the particular attackers before he was shown the pictures. So too, the investigator acting for the defense had been unable to find and question Burns, although the prosecutor had furnished an address for him in Roxbury.

By motion under *Commonwealth* v. *Dougan*, 377 Mass. 303, 316-317 (1979), both defendants requested a voir dire at which Burns and the officers could be questioned in detail and suggestiveness or other fault in procuring identifications might be

---

[5]Wilson's defense rested without offering evidence. Bennett (not party to this appeal) presented testimony of a defense investigator who spoke to Nettles and said Nettles quoted Bennett as saying "they" stabbed Burns, not "we." Bennett also offered a doctor who examined Burns's medical records and said his wounds were not serious.

uncovered.[6] Answering the motion, the prosecutor said she had delivered all the information she had, including an important memorandum from Detective Foley detailing the steps that rounded out the Commonwealth's proof (corresponding to Foley's later testimony at trial). The memorandum reported Nettles telling Foley she heard "Junior" and "Tyrone" were involved in the stabbing. This early suspicion was not testified to at trial, although it appeared in Nettles's voir dire testimony in another connection, to be mentioned below. The prosecutor said a voir dire about identification would not add anything of use to the defense. On the whole submission, the motion judge denied the *Dougan* motion, but directed the prosecution to furnish any additional information about the whereabouts of witnesses.

Further information was turned over (the record is not specific), and the defense got in touch with Burns, but Burns refused to talk. Renewing the motion, the defense alleged the trail to the names and identifications was still unclear. The prosecutor on her part said, about questioning Burns, that he had not been involved in the "convoluted" course of investigation; Burns figured only in choosing from the pictures; for the rest, the Commonwealth had yielded full information. The renewed motion was denied, now by the judge who presided at trial.

We do not find error in the judges' rulings and add that the defense had full scope at trial to test the evidence of identification. Such as it was, it lay before the jury. Cross-examination of Foley, Pacino, and Burns was vigorous. The jury could not fail to appreciate the lacuna, stressed by the defense, between Burns's quite general statement within hours of the attack and his selection of pictures more than a week later.

*Codefendant's extrajudicial statement.* Wilson moved for trial separate from Bennett for fear that at joint trial Bennett's statement to Ross would be admitted in evidence.[7] This, Wilson argued, could be unfairly hurtful to him if, as expected, Bennett would decline to testify and would thus be immune to cross-

---

[6]In *Dougan*, the prosecutor's representations to defense counsel concerning the method or course of identification were evidently incorrect; held, the judge erred in refusing a voir dire.

[7]Bennett also moved unsuccessfully for a severance. He claimed the defendants' respective defenses were antagonistic: any instruction that Bennett's statement not be used against Wilson would highlight its force against Bennett.

examination. The trial judge conducted a voir dire, in which Nettles told the story as outlined above. The judge thought she would exclude at trial any testimony by Nettles that she heard on the street that Bennett and Wilson were involved, but the rest — testimony recounting Bennett's statement — could be admitted without offense to the *Bruton* principle, *Bruton* v. *United States*, 391 U.S. 123, 135-136 (1968). So she denied the motion to sever. Wilson's corresponding motion at trial to exclude the statement was likewise denied, and the statement came in.

The Court in *Bruton* held, by reference to the confrontation clause of the Sixth Amendment to the United States Constitution (binding also on the States), that at joint trial of A and B, a court must exclude evidence of a statement by A, free of cross-examination, that names or otherwise identifies B and "powerfully incrimin[ates]" him. For in that situation a mere instruction to the jury to apply the statement only to A himself would very likely fail to keep this evidence confined to A and clear of B.[8] *Bruton* may thus be thought of as a cautious exception to the general proposition that a jury will be trusted to follow the judge's instructions. Later, the case of *Richardson* v. *Marsh*, 481 U.S. 200, 208 (1987), took the view that a jury could be trusted to follow proper instructions where A's statement did not itself name or otherwise identify B, even if it could tend to incriminate B when considered in connection with other evidence at trial. This led prosecutors to take A's statement, which in its actual wording would fail the *Bruton* test, and redact it by striking out the explicit reference to B. Judges have admitted statements so redacted.[9] In the recent case, *Gray* v. *Maryland*, 523 U.S. 185, 192-195 (1998) (5 to 4 decision), the redaction consisted of erasing the references to B and leaving blanks instead which, when testified to, were each rendered with the word "deleted" or "deletion." The majority of the Court, by Justice Breyer, thought it would be pushing the *Richardson* case too far, and trespassing on the line set by the *Bruton* case, to admit a statement thus suggestively redacted where,

---

[8]For illustration, see *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 674-675 (1989); *Commonwealth* v. *Adams*, 416 Mass. 55, 57-58 (1993).

[9]See *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 477-478, cert. denied, 479 U.S. 838 (1986); *United States* v. *Williams*, 936 F.2d 698, 700-701 (2d Cir. 1991). Contrast *Commonwealth* v. *Adams*, 416 Mass. at 57-58 & n. 2.

by a simple kind of inference from other evidence, the jury, despite instructions, would likely apply the statement to "powerfully incriminat[e]" B.[10] The minority, by Justice Scalia, would hew strictly to the *Richardson* formula. *Id.* at 200-201.

Bennett's actual, unmanipulated statement in our present case tells the reader or hearer that one or more persons, unnamed, anonymous, were with the speaker and in some relation to the stabbing. Wilson was not named or otherwise marked in the statement as a participant, nor was he on hand when Bennett spoke to Ross in Nettles's hearing. If other evidence in the case could be used to personify Wilson in the statement, it would have to be by inferences of a kind far more remote than that in the *Gray* case, and such an hypothesized connection could not serve as a basis for excluding the statement under *Gray* reasoning. This analysis is confirmed by *Commonwealth* v. *Blake*, 428 Mass. 57, 62 (1998).[11] We conclude that the admission of Bennett's statement did not collide with the *Bruton* case or its sequelae and could be properly handled by the jury under firm instructions, which the judge proceeded to give at the close of trial. It is a matter of some interest that the jury acquitted both defendants of assault and battery with a knife.

*Prosecutor's speech.* The prosecutor appears to have exceeded the limits of permissible argument when she adjured the jury in her closing speech to "send a message — that this type of action, of behavior is not going to be tolerated," evidently referring to Bennett's or both defendants' suggested pretension or claim to control the street. See *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 295 (1990). Cf. *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 286 (1988). Upon objection by both defendants, the judge responded sharply, saying, when the prosecutor finished, "Your function as a jury . . . is not to send any message to any community about anything," but to "determine the facts."

The judge admonished before trial that there should be no reference to gangs or gang-related activity, but the defense complains that the prosecutor, without using the prohibited words, edged up to them. She spoke of force in the street, of a group moving in unison, of Bennett, in the presence and with

---

[10]Examples are *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 9 (1973); *Commonwealth* v. *Johnson*, 412 Mass. 318, 323 (1992).

[11]See *Commonwealth* v. *James*, 424 Mass. 770, 783 (1997); *Commonwealth* v. *Santiago*, 30 Mass. App. Ct. 207, 215-216 (1991).

the apparent approval of the group, exacting respect from Burns and threatening and punishing him without reason except that he was seen as an intruder. The prosecutor might well have moderated her zeal in expression, but it is fair to say that there was evidence to support the elements of the picture and it was open to the prosecutor to marshall this evidence and to comment upon it, and to do so even if members of the jury might be prompted to speculate whether this group fitted the definition of a "gang." See *Commonwealth* v. *Kozec,* 399 Mass. 514, 516-517 (1987). The present case may be contrasted with *Commonwealth* v. *Wolcott,* 28 Mass. App. Ct. 200, 209-211 (1990), where "gangs" were mentioned and dwelt on so as to prey on a jury's anxious fears of unpoliceable violence.

*Judgments affirmed.*